665 F.Supp. 734 (1987)
Charles RHONE, Plaintiff,
v.
UNITED STATES DEPARTMENT OF the ARMY, et al., Defendants.
No. 84-1951C(5).
United States District Court, E.D. Missouri.
July 9, 1987.
As Amended July 10, 1987.
*735 *736 Frances Diane Taylor and Ann B. Lever, St. Louis, for plaintiff.
Beacham O. Booker, Dept. of Justice, Civ. Div., Henry J. Fredricks, Asst. U.S. Atty., St. Louis, Mo., Peter B. Leewenberg, Richard E. Hatch, Sp. Asst. U.S. Atty., Chief, Civilian Personnel Litigation, Office of the Judge Advocate General, Dept. of the Army, Washington, D.C., for defendants.

MEMORANDUM
LIMBAUGH, District Judge.
This matter is before the Court to consider cross motions for summary judgment filed by the parties in lieu of trial. The case has been extensively briefed and a substantial body of documents and depositions submitted for factual analysis. Plaintiff, a former career civilian employee of the United States Department of the Army, has brought suit against his former employer alleging violations of § 501(b) of the Rehabilitation Act of 1973, 29 U.S.C. § 791(b), the Administrative Procedure Act, 5 U.S.C. § 706 (hereinafter APA), and the Civil Service Reform Act of 1978, 5 U.S.C. § 1101 et seq., (hereinafter CSRA). The case involves an appeal of a Merit System Protection Board ruling and was transferred to this Court from the United States Court of Appeals for the Federal Circuit pursuant to Williams v. Department of the Army, 715 F.2d 1485 (Fed.Cir.1983).

Statement of Facts
Plaintiff, Charles Rhone, is a 54 year-old United States citizen residing in the Eastern District of Missouri. A former career civilian employee of the United States Department of the Army, Rhone was a 24-year veteran of federal service and was four years short of retirement at the time of his dismissal in October of 1983. In 1954, while in the armed forces, plaintiff was diagnosed as having sarcoidosis, a systematic granulomatous disease characterized by the formation of scar tissue and nodules in the organs and tissues affected. In Mr. Rhone's case, the disease affected his lymphatic, pulmonary and ocular systems. As a result of his military service and his sarcoidosis, Rhone was classified in 1959 as a ten-point compensable, service-connected disabled veteran entitled to a veteran's preference for employment in the federal civil service. Since that time, plaintiff has held a number of positions during his federal employment including work as an elevator operator, electric accounting machine operator, computer systems operator, computer technician, lead computer technician (title later changed to lead computer assistant), computer assistant (SCRAM), and as a supervisory computer assistant. At all times relevant to this case, plaintiff was employed by the United States Army Troop Support and Aviation Material Readiness Command (TSARCOM) of the United States Department of the Army. Within TSARCOM he worked in the Computer Operations and Control Branch of the Computer Management Division (CMD) of the Directorate for Management Information Systems (DMIS).[1]
In 1978, two Department of the Army commands were merged into a single command to form TSARCOM and in the restructuring which accompanied the merger, Mr. Rhone was placed in a permanent position on the second shift (4:00 p.m. to midnight) *737 effective March, 1980. At that time, Rhone was employed as a lead computer assistant.
In January of 1980, defendants received a letter from plaintiff's personal physician, Dr. Earl W. Shelton concerning Mr. Rhone:
This is a medical statement for my patient Charles Rhone. He has a diagnosis of "Boeck's Sarcoidosis" and is having some problems. He is anorexic, losing weight and easily fatigued. He seems to have more problems when working the evening and night shifts. I would therefore recommend the day shift for him. I think this would make it possible for him to continue on the job in spite of his disease condition.
As a result of this letter, Rhone was directed to undergo a fitness for duty examination. Dr. Shelton conducted the examination and wrote a letter in April of 1980 to the Recruitment and Placement Branch of the TSARCOM Civilian Personnel Office:
This is a medical statement for my patient, Mr. Charles Rhone, whom I have known since 1971. He was diagnosed per V.A. Hospital in 1954 as having Sarcoidosis. His main complaints have been weight loss and severe weakness. He is approximately 5 ft-8 inches tall and only weighs 127 lbs. His normal weight should be about 154 lbs. He has lost 13 lbs. over the past 7 years.
Given a patient with a diagnosis of Sarcoidosis, weight loss, marked general weakness I think we would be justified in recommending employment with the least amount of stress. I would therefore suggest that Mr. Rhone be given the day shift, eight a.m. to four p.m. or a shift very close to this.
Based on Dr. Shelton's conclusions and a review by the agency medical officer, plaintiff was assigned effective August 10, 1980 to an "additional identical"[2] (AI) position on the daytime shift working as a GS-35-09 Lead Computer Assistant. Plaintiff remained in this position for approximately two years and deposition testimony indicates that his performance was satisfactory.
Approximately two years after plaintiff was placed in the additional identical position, his supervisors were informed by the personnel office that there were too many AI positions on the DMIS payroll and that steps would have to be taken to eliminate or reduce their number by placing individuals such as Mr. Rhone into authorized permanent positions. As a result, plaintiff was directed to undergo another fitness-for-duty examination in April of 1982 and was told that the purpose of the examination was to update his medical status and determine the necessity for continued or modified restrictions on his assigned duties.
Plaintiff elected to be examined by Dr. Carl Dennison, a private physician, who recommended that plaintiff continue to work on the day shift in order to avoid the fatigue and stress asserted to be incident to the later shifts.[3] Dr. Dennison's evaluation was received by Richard Denness, Chief of the Management-Employee Relations Branch, and forwarded to defendant's occupational health clinic physician, Dr. Santo Taglia. In addition to the evaluation, Dr. Taglia received a memorandum from Denness seeking clarification of certain points raised in Dr. Dennison's report. Specifically, the memorandum questioned the doctor's assumption that day shift work would be less fatiguing to the plaintiff and asked:
a. How does the condition identified above render the employee disabled for night shift work? Why would working night shift necessarily be more fatiguing than working the day shift particularly in light of the fact that the second and third shifts are historically less stressful, pressured or hectic than first shift work? For example more critical scheduling assignments *738 come in during the day shift that the evening or night shifts.
b. If the employee is disabled for work on the second shift, would he also be considered disabled for the third shift (2400 hours to 0800), particularly if his sleeping period ended just prior to the beginning of his work day? If so, how?
Dr. Taglia responded by explaining that he would need more of plaintiff's medical history from Dr. Dennison in order to respond to the questions raised by Denness.[4]
By letter dated May 27, 1982 plaintiff was requested to authorize the release of his medical records from Dr. Dennison. In explaining that the agency medical officer was in need of a clinical history in order to render a final recommendation, a civilian personnel officer, Diane Ottolini, stated that if plaintiff would sign the enclosed release, "[the agency] will then contact Dr. Dennison in order to secure the requested information for Dr. Taglia." Plaintiff cooperated fully and promptly returned the signed authorization form.
On July 20, 1982, the personnel office followed up on its inquiry to Dr. Taglia, explaining that plaintiff's employment status was still unresolved. Taglia responded on July 26, 1982 stating that he had not yet received the additional information from Dr. Dennison and that without it he could not make a clinical judgment. On August 5, 1982, plaintiff was informed by letter that there was insufficient medical information to determine that he was unable to work other than the day shift and that absent additional medical evidence to support his request for a first shift assignment, he should be prepared to work any shift. For the first time, plaintiff was apprised that he would have to take action himself to see that the requested records were forwarded to Dr. Taglia. "Absent such evidence," the letter went on, "you should be considered available for assignment to an appropriate permanent position on any of the three work shifts." Approximately one month later plaintiff was notified that he should consider himself available to work on the third shift commencing in October of 1982. On October 7, 1982, plaintiff requested additional time to obtain his medical records citing time delays with the Military Personnel Record Center.[5] In December, 1982, plaintiff was notified that his request for additional time was denied and that he was required to report to the third shift on January 9, 1983.[6] Plaintiff's medical records arrived at Dr. Taglia's office in late March.
On January 9, 1983, as scheduled, plaintiff reported to his new assignment as a GS-335-09 computer assistant on the night shift. The new position, which involved mass scheduling in the area of resource allocation management ("scramming"), required many of the same skills necessary for a lead computer assistant. The positions differed, however, in at least one major respect in that scramming involved significantly more computer terminal viewing time (85% of a shift as opposed to 20%) than plaintiff's former position. This distinction had adverse consequences for Mr. Rhone. After two months as a scrammer, Rhone began to experience vision problems and on March 16, 1983 he visited a private ophthalmologist. The ophthalmologist referred him to a V.A. hospital but when he found that he could not schedule an appointment with the eye clinic until late April, he went instead on March 21 to see Dr. Taglia at the TSARCOM health clinic. Dr. Taglia diagnosed plaintiff's vision problems as iridocyclitis, an ocular complication caused by sarcoidosis.
Pursuant to this finding, Dr. Taglia provided plaintiff with a note for his supervisor which stated "Iridocyclitis (Sarcoidosis) *739 Assign to area not requiring vision." The next day, plaintiff's supervisor, Carole Pitzer, requested assistance and clarification from Dr. Taglia, pointing out that plaintiff's earlier fitness-for-duty examination did not indicate a problem with vision. The doctor responded on March 24, 1983, the same day that he finally received plaintiff's medical records, and explained:
1. I have received Mr. Charles Rhone's Military Medical Records. In the service, he acquired Pulmonary and Ocular Sarcoidosis, a chronic reticulo-endothelial disorder that is manifested by exacerbations and remissions. In diseases of this nature, it is best to assure the patient of proper rest and well established routines. Therefore, I agree with Dr. Dennison that Mr. Rhone should have remained on the first shift because of the aforementioned reasons.
2. It is probable that his transfer to "Computer Terminals" has created an ocular exacerbation for which he has an opthamalogical consultation in April concerning difficulty with "bluish-green hues and glares." He has also lost 7 lbs. in the interim. On the 1st shift he was not using "Computer Terminals" or visual acuity to the extent required on the night shift.
3. In conclusion then, I would recommend the first shift in the same position from which he was transferred.
On April 8, 1983, Rhone requested reassignment to the first shift.
On April 13, 1983, Carol Pitzer requested additional clarification from Dr. Taglia as to plaintiff's medical status. Specifically, she directed three questions to Taglia: (1) "Is it injurious to Mr. Rhone's health for him to remain in his present position?"; (2) "[If] so, should Mr. Rhone be placed on leave, either voluntarily or involuntarily?"; and (3) "Should Mr. Rhone be placed in the TSARCOM Handicapped Program?" Taglia replied the next day stating the Iridocyclitis can be controlled, and that subjectively it appeared that Rhone's condition had worsened since his job transfer. Taglia apparently reasoned that since Rhone had had no reported vision problems in his previous position, he would probably have no difficulty if he were reassigned to his old job. The doctor declined to express an opinion as to whether Mr. Rhone should be placed on leave. As to Pitzer's last question, his reply was that it "would depend on your absolute or relative need for Mr. Charles Rhone in his present position."
On April 19, 1983, plaintiff's second level supervisor, John Williams,[7] requested that the personnel office arrange yet another fitness-for-duty examination for Rhone. Three days later, plaintiff and his union representative met with both Williams and Pitzer to explain that plaintiff's continued presence on the night shift presented a serious hazard to his health. The situation was characterized as one of "life or death." In response, Williams immediately sent Rhone to Dr. Taglia along with a memo asking whether plaintiff's reassignment to another shift required emergency action. On the same day he requested guidance from the personnel office in determining the appropriate personnel action necessary to protect plaintiff's health.
Dr. Taglia's response to Williams' query was that the exacerbation of plaintiff's condition could lead to "glaucoma, loss of visual acuity, possible surgery, etc." In the meantime, the personnel office, specifically Richard Denness, requested assistance from the Recruitment and Placement Branch of the Civilian Personnel Office in working with DMIS management to determine whether reasonable accommodations could be made to keep Rhone employed. Denness' interpretation of Dr. Taglia's recommendation was that Rhone could not work in a position requiring any use of computer terminals and this assumed limitation prefaced Denness' request for assistance. If reasonable accommodations could not be made that would allow Rhone to remain in his present position, the Recruitment and Placement Branch was requested to locate a suitable vacancy at the same or lower grade where Rhone might be placed.
On May 23, 1983, Denness informed Williams that the Management-Employee *740 Relations Branch had determined that there was sufficient basis to conclude that Rhone was unable to work in his present position without placing his health in jeopardy. The memo referred to continuing contacts with the Recruitment and Placement Branch regarding attempts to accommodate Rhone in his present position or to locate a suitable alternative position. Absent those possibilities, Williams was advised that he could place Rhone on leave, with or without his consent. The next day Williams placed Rhone on enforced leave.
On June 6, 1983, Don Boswell, Acting Chief of the Recruitment and Placement Branch, reported to Denness that placement options for Rhone had been reviewed with DMIS officials, but that no position had been located which met the restrictions outlined earlier by Denness. At that point, Denness realized that neither management nor the personnel office had specifically enlisted the services of the handicapped coordinator, Betty Warr, in finding a suitable position for Mr. Rhone.
Warr, however, testified on deposition that she had been contacted about Rhone in 1982 by the Management-Employee Relations Division. She also recalled that Rhone himself came to her on several occasions with suggestions of positions for which he might qualify. In many instances, his qualifications did not meet the requirements of the positions in question. She did vaguely recall, however, two GS-09 positions within Rhone's directorate in which she attempted to place him.[8] Both were GS-335-09 computer assistant positions on the day shift. Warr spoke with John Williams regarding the positions and Rhone's special circumstances. Although Rhone was qualified for the computer assistant openings, having worked in that capacity for several years, Williams elected to fill both positions competitively (based on seniority and other factors) and placed Rhone in the night shift scramming position.[9] Later, when Denness contacted her in 1983, Warr set about trying to find a suitable vacancy for Rhone in the same or lower grade taking into account his newly manifested medical problems.[10]
Within two days Warr identified two vacant positions on the day shift which offered placement opportunities for Rhone. The first of these was that of Supervisory Computer Assistant, GS-335-08, Booking & Binding/Library section of the Computer Operations and Control Branch. The second position was that of Computer Clerk (Data Transcriber), GS-335-04, Computer Operations Control Unit. On June 17, 1983, John Williams returned Rhone to active duty status to serve in the supervisory computer assistant position on a temporary/trial basis for a period of at least 30 days. Williams made clear that the action was being taken as an alternative to enforced leave and in the interest of accommodating Rhone. The parties stipulated that this job was a second-line supervisory position and that Rhone was given a job description and informed of the applicable performance standards at the time he began work.[11] On July 11, 1983, Carole Pitzer notified Betty Warr that Rhone would not be selected for permanent placement in the position.[12] On July 20, 1983, William *741 Johnson, Chief of the Recruitment and Placement Branch, certified that efforts had been made by that office to identify a suitable position for Mr. Rhone, but that reassignment had not been possible.[13] Six days later, Carole Pitzer requested plaintiff's final removal from the federal service and on August 5, 1983, a letter was dispatched from John Williams notifying plaintiff that he had proposed his removal from federal service on account of physical disability. The letter outlined the unsuccessful efforts to locate a suitable position for Rhone and explained that he could not be retained in the GS-08 position to which he was detailed because (1) his performance was unacceptable, (2) the position would soon require use of computer screens, and (3) the position would require supervisory work on the second and third shifts.
On August 9, 1983, plaintiff replied to the notice of his proposed removal, objecting in general terms and suggesting that he be detailed to a GS-09 Computer Assistant position which he understood to be vacant. On September 27, 1983, James Musch, Deputy Director of Management Informations Systems, who was Williams' superior and the designated "deciding official" in the removal action, issued a letter to plaintiff informing him of the final decision to remove him from federal service. The letter included a detailed summary of the efforts made to accommodate plaintiff over a three-year period and addressed plaintiff's rebuttal to Williams' notice of proposed removal. Among other things, Musch refuted plaintiff's allegation that his medical condition did not warrant his dismissal and cited not only plaintiff's initial medical problems but "a newly identified medical condition ... which allegedly precluded your ability to use computer terminals in the performance of your duties." Musch pointed out that plaintiff had recently been detailed to the GS-08 position as an alternative to enforced leave "[e]ven though he argued, there is no regulatory requirement to offer a lower graded vacant position to an employee found to be physically unable to perform his/her assigned position." Musch maintained that plaintiff was not permanently assigned to the GS-09 position because of poor performance and, "[n]otwithstanding, the need to work on other than the day shift is a real possibility due to supervision of shift personnel on all three shifts. Based on medical evidence, you can neither work on other than the day shift nor use computer terminals." As to the GS-09 computer assistant position that Rhone had inquired of, Musch stated the position was not currently available and that if and when it became vacant, "applicable regulatory procedures will govern recruitment with the issue of seniority handled in accordance with applicable provisions of the Collective Bargaining Agreement ..."[14]
On October 17, 1983, plaintiff timely appealed the agency's action to the United States Merit Systems Protection Board, (MSPB).[15] A hearing was held on that appeal on December 13, 1983 and on December 22 the MSPB hearing officer affirmed the agency action separating plaintiff from employment. The presiding official found that plaintiff was not a "qualified *742 handicapped person" in that he could not perform the essential functions of the lead computer assistant position, even on the day shift, based on a finding that plaintiff could engage in no more than minimal viewing of computer terminals, that utilization of computer terminals was increasing on the day shift, and that plaintiff had not established a prima facie case of handicap discrimination. The official further determined that the agency had not acted improperly in denying Rhone permanent placement in the GS-08 position to which he had been temporarily detailed and that his ultimate removal was an appropriate action under all the circumstances.
Plaintiff filed a timely request for judicial review of the Board's decision with the United States Court of Appeals for the Federal Circuit. On June 25, 1984, the Court of Appeals entered an order transferring the appeal to the United States District Court for the Eastern District of Missouri. The case was assigned to this Court on August 20, 1984.

Conclusions of Law

I.

The Rehabilitation Act
Plaintiff's first cause of action arises under § 501(b) of the Rehabilitation Act of 1973, 29 U.S.C. § 791(b). That section requires departments and agencies in the executive branch to formulate and annually update an affirmative action plan for the employment of handicapped individuals. In addition, however, it also requires the federal government to act affirmatively in order to reasonably accommodate handicapped employees or applicants. Gardner v. Morris, 752 F.2d 1271, 1278 (8th Cir. 1985). These duties have been further defined by EEOC regulations. 29 C.F.R. §§ 1613.701 et seq. Enforcement of rights derived from § 501(b) is available through § 505(a)(1), 29 U.S.C. § 794a(a)(1), of the act which provides a cause of action under Title VII of the Civil Rights Act of 1964.
The general policy of § 501(b) is set forth succinctly in 29 C.F.R. § 1613.703:
Agencies shall give full consideration to the hiring, placement and advancement of qualified mentally and physically handicapped persons. The Federal Government shall become a model employer of handicapped individuals. An agency shall not discriminate against a qualified physically or mentally handicapped person.
That plaintiff was and is "handicapped" under the Rehabilitation Act is not in dispute. Section 706(8)(B) defines a handicapped individual as any person who (1) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment. The regulations define "major life activities" as "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1613.702(c). The evidence in this case shows that plaintiff suffers from chronic sarcoidosis, a disease which has affected his lymphatic, pulmonary and ocular systems, and which defendants readily agree has precluded him from working the evening or night shifts in his division. Further, plaintiff's ocular complication has limited his ability to view computer terminal screens. That plaintiff was terminated from his employment because of these handicaps is established.[16]
The main point of contention in this case has been whether the defendants were required by law to take further steps to accommodate plaintiff's special needs so that he might remain in the federal employ. Specifically, the parties have debated at length whether defendant was obligated to search for an alternative position for the plaintiff, even if at a lower employment grade, and whether, as a factual matter, there were any positions for which plaintiff was qualified. In addition, with regard to some of the positions for which plaintiff claims to have been qualified, the question *743 to be decided is his entitlement to such positions vis a vis other employees.
With regard to the issue of accommodation, the law is clear that the federal government is under an obligation to adjust or modify working conditions for handicapped employees or applicants when necessary. While a federal employer is not required to eliminate any of the essential functions of the position in question, Jasany v. United States Postal Service, 755 F.2d 1244, 1250 (6th Cir.1985), it is required to make reasonable accommodation to an employee's handicaps "unless the agency can demonstrate that the accommodation would impose an undue hardship on the operation of its program." 29 C.F.R. § 1613.704(a) (1986) (emphasis added). The regulations further explain this requirement:
(b) Reasonable accommodation may include, but shall not be limited to: (1) Making facilities readily accessible to and usable by handicapped persons, and (2) job restructuring, part-time or modified work schedules, acquisition or modification of equipment or devices, appropriate adjustment or modification of examinations, the provision of readers and interpreters, and other similar actions.
(c) In determining pursuant to paragraph (a) of this section whether an accommodation would impose an undue hardship on the operation of the agency in question, factors to be considered include: (1) The overall size of the agency's program with respect to the number of employees, number and type of facilities and size of budget; (2) the type of agency operation, including the composition and structure of the agency's work force; and (3) the nature and the cost of the accommodation.
29 C.F.R. § 1613.704.
Of the factors contemplated by the EEOC regulations, only a modified work schedule in the form of a daytime shift assignment would have benefitted plaintiff given his need for proper rest and well-established routines. Especially important in this regard was the need to limit his work period to only one eight-hour period since requiring him to arrive early, stay late, or work on other shifts from time to time would clearly be detrimental to his health given his sarcoidosis.[17] The EEOC regulations specifically state, however, that reasonable accommodation shall not be limited to the factors delineated in 29 C.F.R. § 1613.704(b). In this case there are other sources of authority that will serve to flesh out the duties and obligations owed by the defendant to Charles Rhone.
The Handbook on Reasonable Accommodation, published by the Office of Personnel Management sets forth a readable discussion of the options available for handicapped employees and applicants for federal service. The booklet explains, in less technical terms, the various accommodations listed in the EEOC regulations and details more fully the mechanics of such accommodations. With regard to current federal employees, however, the handbook spells out further courses of action:
In cases of current Federal employees who become disabled after employment, agencies have a responsibility to make every effort for their continued utilization. An employee who, because of illness or injury, is unable to continue to perform the duties of his or her current position should not automatically be retired on disability. Alternatives include:

*744 *Retraining: Agencies should give serious consideration to the possibility of retraining disabled employees for positions for which they have the basic qualifications and capabilities. Although an initial expense is involved in retraining, the result will justify the expenditure if the employee and the position are matched carefully beforehand. Assistance may be available from vocational rehabilitation agencies; and
*Reassignment: The employee's work experience and education may indicate that he or she can perform satisfactorily in another position. Under certain circumstances, an exception may be made to normal qualification standards to facilitate reassignment. Reassignment need not necessarily be limited to positions of the same grade or series. The possibility that the employee would be willing to accept reassignment to a lower grade position with less strenuous physical or mental demands is not to be overlooked.
Handbook On Reasonable Accommodation, United States Office of Personnel Management, p. 10 (emphasis added).
It is clear that the Office of Personnel Management considers reassignment to an available position at the same or lower grade to be a viable means for federal employers to accommodate handicapped employees. The Federal Personnel Manual (FPM) repeatedly prescribes reasonable accommodation through reassignment in both mandatory and directory language. In Chapter 831, the manual provides that agencies "must exhaust all reasonable efforts to alleviate any service deficiencies through accommodation and/or reassignment" before counseling employees to seek disability or supporting his or her request for such retirement. FPM Letter 831-78, Attachment 1, S10-4a. (emphasis added). "When an employee initiates an application for disability retirement, the employing agency must review all vacant positions under its jurisdiction, at the same grade or pay level and tenure in the commuting area, to determine if the employee meets the minimum qualification standards for any vacant position." Id. Furthermore, "[w]here possible, agencies are encouraged to attempt to place an employee in a position at a lower grade or pay level in order to retain the employee in a productive capacity." Id. See also FPM 306 9-2b(1).
As a matter of law the Court finds plaintiff's argument, that reasonable accommodation must often include reassignment, to be compelling. It is clear that the Office of Personnel Management has intended that federal agencies consider reassignment in dealing with employees who have become incapable of performing the essential functions of their present positions. While agencies cannot be expected to search ad infinitum for a position that will correlate with a handicapped employee's remaining abilities and qualifications, this Court believes that federal employers are bound to undertake a reasonable and competent attempt to retain such employees in a capacity in which they are qualified and capable of serving.
The requirement emerges both from the published expressions of the Office of Personnel Management  which the Court considers to be binding on the defendant, and from the strong expressions of congressional and executive policy favoring a liberal employment of handicapped people in federal service. Doe v. Hampton, 566 F.2d 265, 281 (D.C.Cir.1977). This, combined with defendants' demonstrated practice of including reassignment as a means of accommodation, yields the conclusion that defendants were obliged to make a substantial effort to find Mr. Rhone a position in which he could satisfactorily perform without endangering his own health and safety or that of others. See Gardner v. Morris, 752 F.2d 1271, 1281 (8th Cir.1985), Prewitt v. United States Postal Service, 662 F.2d 292, 310 (5th Cir. 1981)[18] In addition, as a matter of sound *745 management policy, it is logical that reassignment should be considered a viable means of accommodation. It will often be less costly to place an employee into a position in which he can perform with little or no further accommodation versus what may approach solicitous coddling if he is propped up in a position where he may be only minimally productive.[19]
In light of this finding, it is necessary to review the evidence on file to determine whether plaintiff could have been reasonably accommodated through reassignment to another existing position for which he was qualified.[20] The Court has determined that there were positions for which plaintiff qualified and that were available during the time that defendants were attempting to accommodate him through reassignment.
In June of 1983, when plaintiff was placed temporarily in the GS-08 Supervisory Computer Assistant position, the handicapped coordinator, Betty Warr, also identified a GS-04 Computer Clerk (Data Transcriber) position which met his qualifications and physical requirements. The latter position had been available since at least March 25, 1983, and was not ultimately filled until August 21, 1983, after plaintiff's removal had been proposed and over one month after the personnel office had certified that no suitable positions could be located to accommodate plaintiff's handicap. While, as previously stated, a federal employer should not be required to conduct an endless hit-and-miss job search for a handicapped employee in hopes of finding a suitable position, agencies are under a substantial obligation to accommodate their employees. In this case it appears that the defendants failed to live up to that obligation, (less by their failure to reassign plaintiff to the GS-04 position after his GS-08 assignment than their failure to place him in the position initially). In June of 1983 it was well established that plaintiff could not be assigned to a position requiring work on more than one shift, yet the GS-08 Supervisory Computer Assistant position to which he was detailed included just that requirement  and defendants have argued the point in defending their decision not to assign him to the position on a permanent basis.[21] Indeed, ignoring the disputed assertions for plaintiff's failure to *746 be permanently assigned to the GS-08 position, it appears that (as plaintiff has argued) his temporary detail to this job was programmed for failure.
The Court is not unmindful that defendants did make some efforts on plaintiff's behalf to accommodate his handicap. Defendants' placement of Mr. Rhone in an additional identical position pending location of a permanent position was a proper and laudable response to his medical problems.[22] From this point, however, there appears to have been little effort on the part of anyone to find plaintiff a permanent position and it was only when the personnel office ordered elimination of excess additional identical positions that this inertia appears to have been overcome.
In addition to the GS-04 position for which plaintiff was passed over, there were other positions for which he was qualified but not selected. In 1980, when Rhone was first placed in the "additional identical" lead computer assistant position, there were two permanent GS-09 Leads on that shift  Catherine Beakley and Margaret McRoberts. In 1981 Catherine Beakley retired and Margaret McRoberts was reassigned to a GS-09 Computer Assistant (SCRAM) position. Only one of these permanent GS-09 Lead positions was filled at that time; a woman named Laverne Caradine was transferred to a first shift position.[23] The other permanent first-shift GS-09 lead computer assistant position remained vacant, at least until January of 1983 when Rhone was reassigned. Plaintiff has made a strong argument that he could have been assigned to the first vacant position ahead of Caradine, despite her greater seniority.
Under the collective bargaining agreement, shift preference is generally decided by length of service in a grade in a particular job series. TSARCOM/NFFE Collective Bargaining Agreement, p. 52. However, the collective bargaining agreement recognizes management's right to assign and reassign employees and provides that the policies of management and the union shall be in "strictest adherence to both the letter and the spirit" of applicable equal opportunity laws and regulations. Id. at 40. In addition, the agreement incorporates the TSARCOM Civilian Personnel Merit Promotion and Placement Plan (TSARCOM Regulation 690-1(j)), which gives precedence to the assignment of handicapped employees.[24]Id. at 42. Furthermore, the collective bargaining agreement provides for consultation and negotiation between the union and management as a means of resolving local personnel problems. If defendants viewed the shift preference provision of the collective bargaining agreement as an obstacle to placing Rhone in the permanent first-shift GS-09 Lead Computer Assistant position ahead of Caradine, they never mentioned it to union officials nor attempted to negotiate the issue. The chief of defendants' personnel division testified on deposition that the negotiation procedure would be the appropriate mechanism for resolving any such conflict. Clearly defendants had the opportunity *747 to at least attempt to place Mr. Rhone in a permanent GS-09 lead computer assistant position on the first shift, a position in which he was experienced, had a solid performance record, and for which at least three doctors believed he was likely to be physically capable of performing.[25]
The second GS-09 lead computer assistant position on the day shift, which was ultimately filled by Mary Gardner on February 4, 1983, appears to have been similarly suited for plaintiff's special circumstances. If Gardner had more seniority or was better qualified than Rhone to assume the post (as for instance, if she could work different shifts), then the same arguments in favor of non-competitive placement would be applicable here. If, as plaintiff maintains, he had more seniority than Gardner, then it is possible that he would have been entitled to the assignment under normal merit system placement guidelines.[26]
The bottom line as to plaintiff's § 501 claim is that there were mandatory avenues of accommodation open to the defendants, such as reassignment, and available positions for which plaintiff was likely qualified and entitled to occupy. This is a very close decision. It should not be interpreted as attributing any bad motives to anyone involved. It does, however, reflect the belief that a more firm commitment on the part of defendants could have avoided plaintiff's termination from federal employment on account of his handicapped condition. In light of these findings, the Court will enter summary judgment in favor of plaintiff on the Rehabilitation Act claim.[27]

Administrative Procedures Act
Plaintiff's claim under 5 U.S.C. § 706, the Administrative Procedures Act, must fail, however, since the standard of review under this act as to factual matters is whether the agency's actions or findings were "arbitrary, capricious, [or] an abuse of discretion" with such review based on the administrative record. 5 U.S.C. § 706(2). Applying this standard, the Court would find for the defendants. Since application of a de novo standard of review under the Rehabilitation Act has yielded a ruling favorable to the plaintiff, the claim is probably moot.

Civil Service Reform Act
Plaintiff's non-discrimination claims under the Civil Service Reform Act, 5 U.S.C. § 1101 et seq., are similarly, not entitled to de novo judicial review. Romain v. Shear, 799 F.2d 1416, 1421 (9th Cir.1986). As with his APA claim, applying the same standard of review, (here, set forth in 5 U.S.C. § 7703(c)), plaintiff cannot prevail. There is substantial support for the defendants' actions and findings in the record.

ORDER
IT IS HEREBY ORDERED that plaintiff's motion for summary judgment is GRANTED as to his claim under the Rehabilitation Act of 1973 and DENIED as to his claims under the Administrative Procedures Act and the Civil Service Reform Act.
*748 IT IS FURTHER ORDERED that defendants' motion for summary judgment is DENIED.
IT IS FINALLY ORDERED that the parties meet and confer within thirty (30) days of this order for the purpose of attempting to reach a settlement as to damages and/or other relief warranted in light of this finding of liability.
NOTES
[1] For the fiscal year in which plaintiff was dismissed from his employment, the total amount budgeted for TSARCOM was $2,680,300,000.00. At this time, TSARCOM has approximately 4,500 civilian employees. The Computer Operations and Control Branch had approximately 147 employees working three eight-hour shifts.
[2] An additional identical position is an employment slot created over and above the number of authorized positions as a means of temporarily placing individuals with special problems or circumstances, pending placement in another permanent position.
[3] Dr. Dennison's conclusions, as set forth in his evaluation report, read as follows: "[History] of chronic Sarcoidosis  unable to perform on nite shift because of [increased] fatigue. Recommend day shift work."
[4] The evidence shows that there was a valid basis for Denness' perplexity. The evening and night shifts are apparently less "hectic" than the day shifts because of lessened activity due to the absence of many personnel whose positions were staffed only on the day shift. The work loads for computer assistants over the three shifts appear to have been comparable.
[5] Plaintiff apparently sought to have his military medical records sent to Dr. Taglia rather than the test results from Dr. Dennison's office.
[6] Mr. Rhone was also notified that if he failed to accept this new assignment, he could be removed from the federal service.
[7] Williams was chief of the Computer Management Division.
[8] Warr testified on deposition that she was relatively certain that there were two positions available at the time. She was certain that there was at least one.
[9] At the time, Rhone's medical records still had not been forwarded to Dr. Taglia and his vision problems had not yet been manifested.
[10] Warr apprently believed that Rhone would have to be placed in a position that required no computer terminal viewing. On deposition, when asked what type of position she was looking for, her answer was: "First of all, I was looking for a position that would be on the first shift, one that would not require use of a terminal and, of course, one that he can meet the qualification criteria."
[11] The parties also stipulated, and the plaintiff emphasizes, that Rhone received no formal training in supervisory duties and responsibilities before or after he was assigned the position. The record indicates, however, that plaintiff had some supervisory experience and was selected partially as a result of that experience.
[12] Pitzer testified on deposition that Rhone's performance in the position was inadequate and she pointed to a number of specific examples to bolster her point. Plaintiff takes issue with this and cites the handicapped coordinator's (Betty Warr) deposition testimony that his performance was never a problem. She asserts the real problem to have been the fact that Rhone could not work the evening and night shifts. Pitzer acknowledged that part of the reason Rhone was not placed in the position permanently was his inability to work on different shifts. The position involved responsibility for supervision of all three shifts and Pitzer testified that it was sometimes necessary to spend substantial amounts of time on duty during a different shift. Pitzer also testified that another factor in her decision not to place Rhone in the position permanently was her perception that he could not view a computer terminal (at all).
[13] The first-shift Computer Clerk (Data Transcriber) GS-335-04 position which became vacant on or about June 1, 1983, and for which Betty Warr determined Rhone to be qualified, was filled August 21, 1983 by an employee who requested a change to a lower grade.
[14] The collective bargaining agreement was between TSARCOM and Local 405 of the National Federal of Federal Employees (NFFE).
[15] Plaintiff also applied for disability retirement benefits after his separation but the Office of Personnel Management denied the application in September of 1984.
[16] The fact that plaintiff was terminated from his job because of his sarcoidosis probably satisfies the third test of § 706(8)(B) i.e. that he was regarded as having a substantially limiting impairment. He also has a "record" of physical impairment.
[17] While the parties have agreed that plaintiff needed to work on the daytime shift, the Court shares in the confusion experienced by the Chief of the Management-Employee Relations Branch, Richard Denness, as to why plaintiff had to work on the daytime shift. (See footnote 4, supra.) If an established routine and proper rest were what the doctor ordered, why then could not a sarcoidosis patient establish a routine around a nighttime shift and schedule an ample sleeping period during the daytime? Certainly there are many people in the work force who work on evening or night shifts who are as well-rested as their daytime shift counterparts.

Since it is established, however, that plaintiff could not "jump around" from shift to shift without damaging his health, it does appear that he was not qualified to work in the GS-08 Supervisory Computer Assistant position since that job, involving supervision of three shifts, necessitated some availability for work on other than the daytime shift.
[18] Citing 29 C.F.R. § 1613,702(f), the definition of "qualified handicapped person." Neither decision discussed whether reasonable accommodation requires reassignment. Besides defendants' efforts on behalf of the plaintiff, the deposition testimony of Betty Warr, Richard Denness, John Williams, and Carole Pitzer revealed that reasonable accommodation at TSARCOM included reassignment to another position at the same or a lower grade.
[19] Of course, § 501 does not mandate retention of employees who cannot perform the essential functions of the position in question (thus the term "qualified handicapped person"). There is no bright line separating those who are "qualified" from those who are not and the determination will vary according to the factors outlined in 29 C.F.R. § 1613.704(c) for calculating "undue hardship" in accommodation. It is clear, however, that in large agencies with large budgets (as here), the agency will be required to expend fairly substantial amounts of time and money to keep handicapped employees on the payroll. While this Court's decision may be viewed as beneficial to handicapped federal employees, it is also intended to provide an option to agencies apart from the occasional harsh choice between termination and retention of a very marginally qualified employee in a given position.
[20] Since this matter is before the Court on cross-motions for summary judgment, the Court is permitted only to consider those facts which are established and uncontroverted by either party. The Court has not based any portion of its ruling on matters involving disputed issues of material fact.
[21] Defendants appear to have made a similarly poor work assignment in December of 1982 when they assigned plaintiff to the GS-09 "scramming" position on the night shift. While his ocular problems were unknown at that point, his inability to work the evening or night shifts was documented in reports from Dr. Earl W. Shelton and substantiated by Dr. Carl Dennison's fitness for duty report. While the agency physician, Dr. Santo Taglia, could not make an independent judgment without receiving more information, the delay in submitting that information cannot be attributed solely to the plaintiff. As the plaintiff argues, defendants likely could have assisted him in obtaining his medical records from the Fitzsimmons Army Medical Center rather than waiting for his request to wind its way through the bureaucracy, (it took several months for the records to arrive). Defendants certainly should have been on notice that there was a strong possibility that plaintiff could not work the night shift and they should have investigated the matter further before placing him on the night shift. Indeed, they had an affirmative duty to do so. Mantolete v. Bolger, 767 F.2d 1416, 1423 (9th Cir.1985).
[22] Defendants certainly were not under any obligation to create a new position in order to accommodate plaintiff.
[23] These facts are supported only by plaintiff's affidavit. Since the defendants have not challenged its accuracy, the Court will assume that plaintiff's account is correct.
[24] Paragraph 8(b) of TSARCOM Regulation 690-1(j) recognizes that there are exceptions to the competitive requirements of the merit promotion and placement plan and refers to Appendix A for a specific listing. Subsection 6(c) of Appendix A allows non-competitive placement of "individuals having statutory, regulatory, or administrative reemployment or restoration rights or a like employment obligation." Section 7(c) allows non-competitive reassignment to positions with no known promotion potential and demotions at the request of the employee. Subsection 7(c)(2)(b) allows a subsequent reassignment in less than one year (the normal requirement) in the following situation: "[When reassignment is] deemed advantageous to the government (e.g. to meet changing workloads, to retain the skills of an employee found to be physically disabled in his/her present position)." It is unclear whether Rhone would have had any possibility of promotion in any of the positions for which he was qualified. See also Appendix E which lists placement actions which must precede competitive consideration, e.g. "statutory/regulatory/mandatory placements directed by higher authority."
[25] Doctors Shelton, Dennison and Taglia all opined that plaintiff would likely have no trouble in his previous (GS-09 lead computer assistant) position. Even after Rhone developed Iridocyclitis, Dr. Taglia's recommendation was: "... I would recommend the first shift in the same position from which he was transferred."
[26] Plaintiff's greater seniority is not established, however, since the parties apparently disagree on this point. Apart from seniority, defendants maintain that the ability to work on different shifts was a necessary requirement of the position. The Court does not believe that availability for work on different shifts should be considered an essential requirement for the lead computer assistant position. The necessity for such shift work does not appear to arise all that often and when it does, a large directorate such as DMIS would appear to have ample personnel available to fill in when needed. This conclusion is supported by 29 C.F.R. § 1613.704(b) which explicitly contemplates "modified work schedules" as a means of reasonable accommodation.
[27] There were numerous other arguments advanced under this claim, some appearing to have merit, others clearly lacking it. Since the Court's ruling effectively decides the Rehabilitation Act claim, these other issues need not be reached.