Terry J. ECKLES, Plaintiff,

v.

**CONSOLIDATED RAIL CORPORATION,
United Transportation Union International, United Transportation Union Local 1963, Defendants.**

No. IP 93–0684–CH/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

July 5, 1995.

---

Susan L. Kuss, Kuss & Schneider, Indianapolis, for plaintiff Eckles.

Kevin C. Brodar, Associate General Counsel, United Transp. Union, Cleveland, OH, and Frederick W. Dennerline, III, Fillenwarth Dennerline Groth & Baird, for Union Transp. Union and Union Local 1963, Cynthia L. Wodock, White & Raub, Indianapolis, IN, for Conrail.

## MEMORANDUM OPINION ON MOTIONS FOR SUMMARY JUDGMENT

HAMILTON, District Judge.

This case raises an important issue about the relationship between an employer's duty of reasonable accommodation under the Americans with Disabilities Act ("ADA") and its duty to comply with seniority systems established by collective bargaining. Plaintiff Terry Eckles claims in this case that he is disabled by epilepsy. He also claims that the only reasonable accommodation for his condition is a job and shift assignment that would conflict with the seniority system established by a collective bargaining agreement. He has sued both his employer and his union. The defendants have filed motions for summary judgment raising several issues. Their principal arguments are that the ADA does not require them to accommodate a disabled employee by violating their agreed seniority system, and that Eckles' demand for a special placement under a provision of the collective bargaining agreement that allows waiver of the seniority system is preempted by the Railway Labor Act ("RLA"). The defendants' motions also challenge whether Eckles is an "individual with a disability" under the ADA and whether he was offered another form of reasonable accommodation. Because the court finds that genuine issues of material fact bar summary judgment on those two issues, the court must reach the seniority system issues. The court concludes that the ADA does not require as a "reasonable accommodation" actions that would violate a bona fide seniority system at the expense of other employees' rights under a collective bargaining agreement. The court also finds that Eckles' demand for a waiver under the agreement is preempted by the Railway Labor Act and that Eckles' claims of retaliation are not supported. The court therefore grants both defendants' motions.

*Undisputed Facts*

For purposes of the defendants' motions, viewing the evidence in the light most favorable to plaintiff, the following facts are material and not disputed. In 1992, plaintiff Terry Eckles worked for defendant Consolidated Rail Corporation ("Conrail") as a yardmaster at its rail yard in Avon, Indiana. He was a member of defendant United Transportation Union International and its Local 1963 ("the Union") and was covered by the collective bargaining agreement in effect at that time between the Union and Conrail. Eckles held an "extra board" position at Avon that required him to work various shifts to fill in for absent or vacationing yardmasters. As a yardmaster at Avon, he was required to work in an enclosed office at the top of a three or four story tower. The office could be

reached only by climbing several flights of open, outdoor metal stairs. Eckles almost always remained alone in the office for his entire shift. He was responsible for "yarding" incoming trains and was in constant radio and telephone communication with train crews and other Conrail employees. However, the communications systems were not set up to be voice activated in case the yardmaster is unable to operate them manually.

Eckles had a seizure in May 1992 and was diagnosed with epilepsy. He was treated for his epilepsy by neurologist Leo D'Ambrosio. On June 25, 1992, Dr. D'Ambrosio found that Eckles could return to work on July 13, 1992, but that he should "not work at heights or operate dangerous equipment," and that it was "preferable that he not work the night shift." Eckles was not to work at heights because of the possibility of having a seizure and falling. He was to avoid the night shift because his condition required a regular sleep schedule. His "extra board" position at Avon did not satisfy either requirement.

On July 7, 1992, Eckles notified Conrail that he wanted to invoke a provision in the Union's collective bargaining agreement, Rule 2–H–1, that would allow him to displace a more senior employee from the extra board position at Conrail's Hawthorne Yard in Indianapolis. At the Hawthorne Yard, the yardmasters' offices are on the ground level and people outside the offices can see inside them easily. Rule 2–H–1 provides that, upon written agreement of Conrail and the Union, a disabled employee may be placed in a position occupied by another employee without regard to seniority, provided the disabled

employee is capable of performing the required duties.[1]

Conrail representatives met with Eckles to discuss the accommodations he needed to return to work. They accepted Eckles' characterization of his restrictions and sent a written request to the Union's local chairman, Ron Clark, for agreement to place Eckles at Hawthorne pursuant to Rule 2–H–1. At first, Clark refused, but he agreed to the special placement after Eckles filed a charge with the Equal Employment Opportunity Commission ("EEOC") on July 27, 1992. (The employment provisions of the ADA took effect on July 26, 1992.) Conrail and the Union agreed to place Eckles on the second shift at Hawthorne, displacing an employee more than thirty slots ahead of Eckles on the yardmaster seniority roster. (Eckles could not work the extra board position he had originally requested because of the restriction on night shift work.)

Eckles began to work at the Hawthorne Yard on July 30, 1992. Shortly after his return, Dr. D'Ambrosio modified Eckles' restrictions to permit him to work an occasional third shift. By fall 1992, Dr. D'Ambrosio had eased his restriction on operating dangerous equipment to permit Eckles to drive a car to and from work. On October 19, 1992, acting for the Union, Clark asserted that Eckles' restrictions had thus been lifted, and he rescinded the Union's agreement to Eckles' placement at the Hawthorne Yard pursuant to Rule 2–H–1. On November 9, 1992, Conrail advised Clark that a review of Eckles' medical records did not indicate that his status had changed. Conrail asked Clark to

1. Rule 2–H–1 provides in full:

*Disabled employees-placement of.* (a) Subject to agreement, in writing, between the Manager–Labor Relations and Division Chairman, a disabled employee covered by this Agreement may be placed in a new position or vacancy, or position or vacancy that is under advertisement but not yet filled, or in a position occupied by another employee, without regard to seniority, provided such an employee is capable of performing the duties required. An employee who is so placed shall be compensated at the rate of the position in which he has been placed.

(b) An employee who has been placed in a position set forth in paragraph (a) hereof shall forfeit his right to continue in such position if he

thereafter bids for other advertised positions or vacancies, and such position shall be advertised. In such case, if the disabled employee is not awarded the advertised position or vacancy for which he has bid he shall exercise his seniority to a position the duties of which he is capable of performing.

(c) A position in which a disabled employee has been placed by agreement under paragraph (a) hereof shall not be subject to the seniority or advertising provisions of this Agreement, except that a disabled employee so assigned may be displaced by a senior qualified employee if there is no other position covered by this Agreement to which such senior employee can exercise seniority.

reconsider and to allow Eckles' continued placement in the Hawthorne Yard. Clark refused. Effective November 14, 1992, Clark himself "bumped" Eckles from the position and took it himself pursuant to the seniority provisions of the collective bargaining agreement. Eckles went on involuntary sick leave. He did not return to work until April 28, 1993, when he was able to exercise his own seniority to claim a new position at Hawthorne that he believed was compatible with his restrictions.[2]

Between November 15, 1992, and April 26, 1993, Conrail representatives conferred internally and with Eckles, reviewed Eckles' medical records, requested further information from Dr. D'Ambrosio, and tried to persuade the Union to reconsider the Rule 2–H–1 placement. Eckles refused Conrail's offers that he work at Avon with assistance in climbing stairs and insisted he be placed at Hawthorne pursuant to Rule 2–H–1. Eckles says that the idea of someone accompanying him up and down the stairs at Avon was found to be medically unsound by Dr. D'Ambrosio. Eckles refused that proposed accommodation, and there is a factual dispute as to whether other accommodations were offered and/or rejected.

On April 28, 1993, Eckles was able to exercise his seniority to bid into a newly opened extra board position at the Hawthorne Yard. The job met all of his medical restrictions so no special placement was required. Nevertheless, Eckles continued to request a Rule 2–H–1 placement in that position so that a more senior yardmaster could not bump him. The Union refused to agree to the special placement.

On June 4, 1993, Eckles had a seizure on the job. After his doctor released him to return to work, Eckles underwent a return-to-work physical examination on June 30, 1993. Because the seizure had occurred at work, the decision whether to qualify Eckles for service was deferred to Conrail's medical director, who had disqualified Eckles from

any work. Eckles went back on involuntary sick leave and was paid pursuant to the collective bargaining agreement. On September 10, 1993, after further review of Eckles' medical records and additional information supplied by Dr. D'Ambrosio, Conrail instructed Eckles to report for another return-to-work physical. On September 27, 1993, Dr. Hawryluk, Conrail's company physician, approved Eckles' return to work with his original restrictions, including no third shift work.

Eckles again requested a Rule 2–H–1 placement because of his restrictions. On behalf of the Union, Clark refused. Because Dr. Hawryluk's interpretation of Eckles' restrictions allowed the climbing of stairs under some circumstances, Conrail instructed Eckles to exercise his seniority to a position at Avon. Eckles refused, continuing to raise concerns about the stairs. Eckles was given an extension of time to bump into a position while the parties continued their dialogue.

On October 26, 1993, Dr. Hawryluk advised Conrail that Eckles' restrictions had been relaxed to permit him to work an occasional third shift. That change allowed him to bid on an extra board position at Hawthorne based on his seniority. Since October 1993, Eckles has held that position without special placement under Rule 2–H–1.

Relevant to Eckles' claims of retaliation, Conrail deducted certain "offset payments" from Eckles' disability pay from November 1992 through January 1995. The deductions were to be made in the event Eckles received payments from the Railroad Retirement Board. However, Eckles did not receive payments from the board because it did not consider him disabled. Conrail eventually remedied this problem by reimbursing Eckles for the deductions it had made on January 24, 1995, although it did not pay him interest. Further, Eckles asserts that Conrail improperly failed to certify him as disabled to his health insurers.

---

**2.** While on sick leave, Eckles was paid 90% of his straight time salary, for seven days, then 70% of his straight time salary, pursuant to the collective bargaining agreement. According to Eckles, Conrail deducted some of his pay as a setoff for Railroad Retirement Board payments that Con-

rail thought he should receive, but which he did not actually receive. Those setoffs were eventually paid back, but while he was on sick leave, Eckles says, he actually received about 47% of his regular pay.

Eckles brought this action on May 25, 1993, under the Americans with Disabilities Act. He claims that Conrail and the Union violated the ADA by refusing to provide reasonable accommodation for his disability in that they failed to assign him to a yardmaster position at the Hawthorne Yard consistent with the medical restrictions on his activities. He claims that Conrail and the Union were required to give him a special placement under Rule 2–H–1 of the collective bargaining agreement to allow him to hold such a position despite his lack of seniority. Eckles also claims Conrail's actions in refusing to certify him as disabled and deducting certain amounts from his paychecks were in retaliation for his filing of an EEOC charge and the present lawsuit. Both defendants have moved for summary judgment.

### Summary Judgment Standard

When deciding a motion for summary judgment, the court views the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986). Summary judgment should be awarded if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Liberty Lobby*, 477 U.S. at 247, 106 S.Ct. at 2510. A factual issue is material only if resolving the factual issue might affect the suit's outcome under the governing substantive law. *Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir.1992). "Irrelevant or unnecessary factual disputes do not preclude summary judgment." *Id.*

Rule 56 requires Conrail and the Union as the moving parties to show there is no genuine issue on an essential element of Eckles' claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The burden then shifts to Eckles to show a genuine issue of material fact. An issue is "genuine" when the non-moving party comes forward with evidence sufficient to enable the trier of fact to find in his favor on the issue. *See Celotex*, 477 U.S. at 324, 106

S.Ct. at 2553; *Methodist Medical Center of Illinois v. American Medical Security, Inc.*, 38 F.3d 316, 319 (7th Cir.1994). In determining that question, Eckles is entitled to the benefit of favorable inferences from the evidence, so long as those inferences are reasonable. *Jones v. Merchants National Bank & Trust Co.*, 42 F.3d 1054, 1057 (7th Cir. 1994).

### The Merits

Eckles claims that his epilepsy required that he work on ground level, in a location where others could see him, and only during first or second shift. As a practical matter, these conditions required that he be transferred from Avon to Hawthorne and be given preferences over more senior yardmasters in scheduling. Eckles claims that the ADA's requirement that disabled employees be reasonably accommodated required Conrail and the Union to place and maintain him in the Hawthorne position without regard to the seniority of other employees who would have first claim on the position under the collective bargaining agreement. In the alternative, Eckles relies on Rule 2–H–1, the provision in the collective bargaining agreement that permits Conrail and the Union to agree to such a transfer of a disabled employee. He argues that the ADA required that Conrail and the Union agree to place him under that provision.

The defendants' motions for summary judgment raise several issues. The Union argues that Eckles does not qualify as an individual with a disability. Both the Union and Conrail argue that they each offered Eckles a reasonable accommodation. Conrail claims that it offered Eckles a reasonable accommodation by offering to have someone else accompany him up and down the stairs at Avon. The other offers of accommodation from Conrail would have come at the Union's expense, and the Union's proposals would have come at Conrail's expense. After examining Eckles' situation, Conrail points out, it asked the Union to agree to a transfer under Rule 2–H–1. The Union refused at first, but upon reconsideration agreed to the transfer and allowed Eckles to bump a more senior employee at the Hawthorne yard. Conrail

says that all was fine until the local Union chairman, Ron Clark, decided that Eckles' medical condition no longer required the accommodation. Clark rescinded the Union's agreement for the 2–H–1 transfer and took for himself the position that Eckles had held. Conrail points out that it never rescinded its agreement to the transfer, but that it could not unilaterally place Eckles in the Hawthorne position without breaching the collective bargaining agreement. Conrail does not oppose the accommodation Eckles seeks—placement despite lack of seniority. That approach would obviously cost Conrail nothing, but would instead come at the expense of other employees. The Union argues that it offered reasonable accommodation by proposing that Conrail either provide another employee to escort Eckles on the stairs, or create a new position at ground level for Eckles, or promote Eckles to trainmaster. These solutions, of course, would have come at Conrail's expense.

As explained below, the court finds in Sections I and II that genuine issues of material fact prevent summary judgment on the issues whether Eckles was an individual with a disability and whether the other accommodations offered by Conrail and the Union were reasonable. The court must therefore reach the primary issues raised by the defendants. In Section III, the court concludes that the ADA does not require as accommodation a job assignment that would violate the bona fide seniority system in the collective bargaining agreement. In Section IV, the court concludes that, to the extent Eckles claims a right to a placement under Rule 2–H–1 of the collective bargaining agreement, his claim is preempted by the Railway Labor Act and must be resolved as a "minor dispute" under that Act. In Section V, the court finds that Conrail is entitled to summary judgment on Eckles' retaliation claims. The court therefore grants defendants' motions for summary judgment.

*I. Is Plaintiff A "Qualified Individual With A Disability"?*

■ The Union argues that Eckles does not have a "disability" under the ADA. The

Union acknowledges that Eckles has epilepsy but argues that not everyone who has epilepsy is automatically disabled under the Act, and that Eckles was not substantially limited in any major life activity.

To qualify as an individual with a disability under the ADA, Eckles must have an impairment that substantially limits a major life activity. 42 U.S.C. § 12102(2)(A).[3] Here the undisputed facts show that Eckles' epilepsy is a physical impairment. His condition has caused him to have at least two grand mal (violently disruptive) seizures in the past, and it currently causes him to have less violent but still disruptive petite mal seizures. Even with medication to control the frequency of his grand mal seizures, they may occur again at any time. Federal regulations support the conclusion that epilepsy should normally be considered an impairment under the ADA. *See* 29 C.F.R. Pt. 1630 App. (ADA Interpretive Guide) (interpreting 29 C.F.R. § 1630.2(h)) ("an individual with epilepsy would be considered to have an impairment even if the symptoms of the disorder were completely controlled by medicine"); 29 C.F.R. § 1615.103 (epilepsy is a "physical impairment" under Rehabilitation Act). The more difficult question is whether, in this particular case, Eckles' epilepsy substantially limits a major life activity. The Union argues that, even assuming Eckles' asserted restriction, his impairment precludes him from doing only one thing relevant to his work as a yardmaster—climbing stairs. The Union argues further that Eckles could work in any yardmaster position where climbing stairs is not required. Therefore, the Union concludes, Eckles does not have an impairment that substantially limits a major life activity.

The Union's argument is based on the "single job" theory. An often cited example is a person with acrophobia who receives nine offers for employment as an accountant that she could accept, but must turn down a tenth offer because the office is on the 37th floor. That person cannot be considered disabled on the basis of her acrophobia. *See*

---

**3.** This case does not present any issue of discrimination based on a record of impairment or on a perceived impairment. *See* 42 U.S.C. § 12102(2)(B) & (C).

*Forrisi v. Bowen,* 794 F.2d 931, 934–35 (4th Cir.1986) (Rehabilitation Act); *E.E. Black, Ltd. v. Marshall,* 497 F.Supp. 1088, 1099 (D.Hawaii 1980) (same). The single job theory has been codified in the ADA regulations. *See* 29 C.F.R. § 1630.2(j)(3)(i) ("[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of 'working'").

There are three problems with the Union's argument. First, other courts have consistently found epilepsy to be a handicap or disability. *See Susie v. Apple Tree Preschool and Child Care Center, Inc.,* 866 F.Supp. 390, 395 (N.D.Iowa 1994) (assuming that epilepsy is a disability under ADA); *Reynolds v. Brock,* 815 F.2d 571, 573 (9th Cir.1987) (finding epilepsy to be handicap under Rehabilitation Act and collecting other cases finding the same); *Mantolete v. Bolger,* 767 F.2d 1416, 1419–20 (9th Cir.1985) (epilepsy is handicap under Rehabilitation Act even though person averaged only one grand mal seizure per year).[4] Second, Eckles disputes the Union's factual premise. He claims that he is restricted not only from climbing stairs such as those at the Avon yard, but that he is also prohibited, with occasional exceptions, from working night shifts. Third, Eckles says that the test for substantial limitation encompasses non-work activities as well. *See* 29 C.F.R. § 1630.2(i) ("Major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.").

Concerning the single job theory, the Union has not shown that the yardmaster position at Avon is the only job Eckles is precluded from working because of his epilepsy. There are many jobs outside the yardmaster position that Eckles cannot perform because of his impairment, and the Union has not even shown that a significant number of other yardmaster positions do not also require the climbing of stairs to reach a tower. The evidence in favor of Eckles on this issue

creates a genuine issue of fact as to whether he has a "disability" for purposes of the ADA. *See Byrne v. Board of Education,* 979 F.2d 560, 564–65 (7th Cir.1992) (recognizing validity of single job theory, but stating that determination of handicap under Rehabilitation Act also includes consideration of number and type of jobs person is disqualified from, geographical area to which person has reasonable access, and ability to perform activities outside work).

## II. Did The Employer or Union Offer Plaintiff A "Reasonable Accommodation"?

■ Conrail argues that the court need not reach the seniority issue because Conrail fulfilled its duty of reasonable accommodation by offering to provide Eckles with someone to accompany him when using the stairs at Avon. Eckles refused that offer and contends that assignment to a ground-level yardmaster position at Hawthorne was the only possible form of reasonable accommodation.

■ The ADA does not require that an employer provide the best accommodation possible to a disabled employee. 29 C.F.R. Pt. 1630 App. (interpreting 29 C.F.R. § 1630.9). Nor is an employer required to accommodate a disabled employee in exactly the way he or she requests. *Vande Zande v. State of Wisconsin Department of Administration,* 851 F.Supp. 353, 359 (W.D.Wis.1994), *aff'd,* 44 F.3d 538 (7th Cir.1995). An employer need only provide a "reasonable" accommodation. *See* 42 U.S.C. §§ 12111(9), 12112(b)(5)(A); 29 C.F.R. § 1630.9; 29 C.F.R. Pt. 1630 App. (interpreting § 1630.9); *Vande Zande,* 851 F.Supp. at 359–60.

If Conrail's offer to have someone accompany Eckles on the stairs at the Avon tower were sufficient, as a practical matter, to protect Eckles from possible harm resulting from an epileptic seizure, then Conrail would have fulfilled its duty of reasonable accom-

---

4. An excerpt from the legislative history of the ADA points out that a "person with epilepsy may require constant shifts rather than rotation from day to night shifts." H.R.Rep. No. 485(II), 101st Cong., 2d Sess. 62 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 303, 345. Shift assignment as part of an accommodation for an employee with epilepsy is one of the issues in this case. The legislative history assumes that the court would reach the accommodation issue, which necessarily assumes that the employee with epilepsy will be found disabled.

modation as a matter of law. Conrail argues that Eckles refused that proposed accommodation and that the evidence supports the fact that he could safely climb the stairs with assistance. Conrail asserts that the medical evidence shows that Eckles was restricted from working at high places but not from climbing a few flights of stairs, especially where he has assistance. Conrail also argues that the fact Eckles' physician allows him to drive a car to and from work undermines his claim that he cannot safely climb stairs.

In response, Eckles points to the testimony of his neurologist, Dr. D'Ambrosio. In his deposition, Dr. D'Ambrosio stated that working at heights or in an unenclosed or unprotected area—for example, being on a ladder—posed a significant risk to Eckles if he were to have a seizure. Dr. D'Ambrosio at first told Conrail's company physician, Dr. Hawryluk, that Eckles could climb stairs, but later modified his opinion when he saw pictures of the exterior stairs at the Avon tower. In both his deposition and an affidavit, Dr. D'Ambrosio stated that Eckles' condition calls for a restriction against climbing the stairs at Avon.

It is less clear that Dr. D'Ambrosio has restricted Eckles from climbing the stairs even if he has someone to accompany him. At his deposition, Dr. D'Ambrosio testified as follows:

Q: Would there been (sic) any way to— and I'm not asking you to be an architect or engineer, but if there was some way to fill in the spaces in between the rails there and make it a little bit safer, would that be okay?

A: That would be safer. An elevator would be the best, or someone to escort him.

Q: That would be fine, if someone would escort him up in there?

A: That would be better, yeah. Someone could catch him—big enough. Terry is a big guy.

While D'Ambrosio did say that an escort would be better than tinkering with the spaces in between the rails of the stairs, he did not say that it would be an adequate accommodation to release Eckles' restriction against climbing stairs. There is also evidence in the record that Conrail's doctor recommended that Conrail respect the restriction imposed by Dr. D'Ambrosio that Eckles not climb more than one flight of stairs. *See* Hawryluk Deposition, pp. 38–54, Ex. 117–18, 120, 127–28. In fact, Conrail opposed the Union's rescission of Eckles' Rule 2–H–1 placement in the fall of 1992 because it was Conrail's position that Eckles' restrictions had not changed.

■ On this issue, Conrail has not met its burden under Rule 56 of coming forward with evidence to show the absence of a genuine issue of material fact as to the reasonableness of its proposed accommodation. The medical evidence in the record is too equivocal to establish beyond dispute that Eckles could have used the stairs at Avon safely with assistance. The argument that, if Eckles can drive a car, he can surely climb stairs has some rhetorical and logical appeal, but Conrail is not entitled to summary judgment on the issue of reasonable accommodation concerning the proposed escort at Avon. As for other proposals for accommodation made by the Union, they all would have required Conrail to take the necessary action. One covered entity cannot satisfy its own obligation to provide reasonable accommodation merely by proposing that another covered entity take some action at its own expense. Thus, neither defendant is entitled to summary judgment on the basis that Eckles was offered a reasonable accommodation.

III. *Does The Americans With Disabilities Act Require The Employer And Union To Violate The Seniority System In The Collective Bargaining Agreement?*

■ Eckles complains that he is the victim of discrimination in two principal respects under the ADA. First, he claims that Conrail and the Union have failed to make reasonable accommodations to his disability. *See* 42 U.S.C. § 12112(b)(5)(A). Second, he claims that Conrail and the Union are participating in a contractual arrangement that has the effect of subjecting him to the discrimination prohibited by the ADA. *See* 42 U.S.C. § 12112(b)(2). The second claim derives

from the first, so the central issue in this case is whether the ADA requires Conrail and the Union to provide the accommodation that Eckles demands. Eckles insisted that the only reasonable way to accommodate his disability was an assignment to the ground-level office at Hawthorne Yard without third shift responsibilities. Because all positions that met his requirements were filled by employees with more seniority, he could have been accommodated in this way only by violating the terms of the seniority system established by the collective bargaining agreements between Conrail and the Union. (Eckles has argued that Rule 2–H–1 shows that he could have been accommodated without violating the terms of the seniority system, but Rule 2–H–1 unequivocally requires a written agreement between Conrail and the Union to any particular assignment that would otherwise violate the seniority system. In this case, the Union agreed temporarily but later rescinded its consent.) Accordingly, the case squarely presents the issue whether a disabled employee's right to reasonable accommodation under the ADA can include a new job assignment that would violate the terms of a bona fide seniority system under a collective bargaining agreement.

The issue is one of statutory construction, so the starting point must be the statutory language. The ADA does not expressly address the question presented here, but it does offer some guidance. "Reasonable accommodation" is the concept at the heart of the ADA. Congress was concerned not only with intentional discrimination against people with disabilities, but also with obstacles to job opportunities resulting from inertia or thoughtlessness about such topics as job qualifications or accessibility of workplaces. Without the requirement that employers and other covered entities (including unions) make reasonable accommodations, the ADA would do much less to allow persons with disabilities to work and lead productive lives.

 Congress took this concept of reasonable accommodation from the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–794, and intended a "fact-specific, case-by-case approach" in determining reasonable accommo-

dations. H.R.Rep. No. 485(II), 101st Cong., 2d Sess.1990, *reprinted in* 1990 U.S.C.C.A.N. 303, 344, 1990 WL 125563 (Leg.Hist.) (hereafter cited as printed in U.S.C.C.A.N.). The ADA provides that the term

> "reasonable accommodation" may include—
>
> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
>
> (B) job restructuring, part-time or modified work schedules, *reassignment to a vacant position,* acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or polices, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9) (emphasis added). The statutory definition provides a list of forms of accommodation, but the language makes clear the list is not exhaustive. At the same time, the specific reference in the statute to reassignment to a *vacant* position reflects a deliberate choice—Congress did not intend to require reasonable accommodation that would include "bumping" other employees from positions they hold.

The statutory provisions of the ADA provide little guidance as to how the Act should affect or be integrated with collective bargaining agreements. The ADA provides that discrimination includes "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination" prohibited by the ADA and states that "such relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of a covered entity, or an organization providing training and apprenticeship programs." 42 U.S.C. § 12112(b)(2). Since discrimination includes "not making reasonable accommodations," that broad language based on "effect" could be interpreted to render irrelevant and unenforceable any term in a collective bargaining agreement that stands as an obstacle to an otherwise "reasonable accommodation." There is no

indication elsewhere in the statute or its legislative history, however, that Congress intended to brush aside collective bargaining agreements.[5] The legislative history suggests only that the language in (b)(2) was designed to prevent deliberate evasion of the ADA through contracts with third parties. *See* 1990 U.S.C.C.A.N. at 342 ("basic intent of this provision is that an entity may not do through a contractual provision what it may not do directly"; examples do not address collective bargaining agreements). The purpose of the broad prohibition on discrimination through contractual provisions is clear, but there is no indication in the statute or elsewhere that Congress intended, by that language, to impair the rights of other employees under bona fide seniority systems under collective bargaining agreements.

The ADA's requirement of reasonable accommodation creates several potential conflicts with federal labor laws governing collectively bargained agreements, including both the National Labor Relations Act ("NLRA") and, as in this case, the Railway Labor Act. The federal agencies with primary responsibility in these areas have considered the problems but have not resolved them. The General Counsel of the National Labor Relations Board addressed some of these potential conflicts in a published memorandum in 1992. NLRB Gen. Couns. Mem. 92–9 (Aug. 7, 1992), *reprinted in* 1993 WL 407395 (N.L.R.B.G.C.). The General Counsel pointed out that an employer's unilateral accommodation might violate federal labor law if the change was significant and inconsistent with established employment practices, "such as a seniority system." 1993 WL 407395 at *1. The ADA's requirement that an employer consult with a disabled employee about accommodation could conflict with the NLRA's prohibition on "direct dealing" between an employer and a represented employee, and the obvious solution of bringing the union into the consultations raises concerns about the ADA's requirements that information about an employee's medical condition or history be kept confidential. *See id.*

at *3. Where a requested accommodation would impose a burden on non-disabled employees, the union's duty of fair representation would also come into play. *Id.*

The General Counsel also asked the question presented here: whether an employer could unilaterally implement a proposed accommodation for a disabled employee that conflicts with the collective bargaining agreement. *Id.* at *2. The General Counsel did not attempt to answer that question but did offer some general comments: "A party would have no right under the NLRA to insist on adherence to contract terms that are, on their face, violative of the ADA. On the other hand, if the contract provision relied on is neutral on its face, a party may argue that it should be entitled to rely on its Section 8(d) [29 U.S.C. § 158(d) ] right to refuse to discuss or agree to a proposed accommodation, inconsistent with that provision, if an adequate alternative arrangement existed that would not conflict with the collective bargaining agreement." *Id.* The General Counsel deferred more specific guidance in such cases until case law developed. And here we are.

The EEOC also looked closely at the challenge of integrating the ADA with collective bargaining agreements. In its initial round of rulemaking under the ADA, the EEOC summarized the conflicting views it had received and said that the "divergent views expressed in the public comments demonstrate the complexity of employment-related issues concerning insurance, workers' compensation, and collective bargaining agreement matters. These highly complex issues require extensive research and analysis and warrant further consideration." 56 Fed.Reg. 35,727 (1991). The EEOC said it would "consider the public comments that it had received . . . as it develops further guidance in the area." *Id.* Consistent with a House committee report on the ADA (discussed below), the further guidance from the EEOC stated that the terms of a collective bargaining agreement "may be relevant" in deter-

---

5. The regulations describe the contractual relationship covered by the statute in part as those with labor unions, "including collective bargaining agreements." 29 C.F.R. § 1630.6(b). This gives no clearer indication, however, that the statute is designed to impair seniority provisions in collective bargaining agreements.

mining whether an accommodation would impose an undue hardship. Despite the "extensive research and analysis," however, the EEOC did not explain when the agreement's terms will actually be relevant, or how they will be relevant, or how employers, unions, judges, or juries should go about assessing the issue. *See* EEOC, *A Technical Assistance Manual on the Employment Provisions (Title I) of the Americans with Disabilities Act* ch. III, at 3.9 (1992), *reprinted in* 2 Americans with Disabilities: Practice and Compliance Manual (Law. Coop.), Regulations and Other Agency Materials (tab), at 92.

In this case, the federal statute governing this collective bargaining agreement is the Railway Labor Act, but the governing principles are not substantially different from those that would apply under the National Labor Relations Act. *See generally Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977) (addressing relationship between Title VII claim for religious discrimination and a seniority system governed by RLA pursuant to 45 U.S.C. § 181).[6]

 To resolve these potential conflicts between the ADA and federal labor laws, the courts must look for guidance first in the governing statutes. Where the statutes fail to provide clear guidance, the courts may turn to other sources, including the relevant legislative history and prior case law that Congress had in mind in drafting the statutes at issue. The lack of statutory guidance, the ambiguity of the legislative history, the widely divergent views of commentators, and the difficulties encountered by the NLRB and EEOC in offering meaningful

guidance on the seniority issue should all give any court pause in trying to decide it. The seniority issue is especially difficult because, unlike most issues under civil rights laws, it pits the interest of one employee directly against the interests of another. Perhaps, then, it is not surprising that clear answers are hard to find.

 As noted above, the text of the ADA offers little guidance on the critical issue here. However, when Congress enacted the ADA, it did so against the backdrop of the Rehabilitation Act and a substantial body of case law under that act dealing with issues very close to the one presented here under the ADA. "In drafting the ADA, Congress drew upon and incorporated standards developed under the Rehabilitation Act. Therefore, the ADA is to be interpreted consistently with the Rehabilitation Act." *Vande Zande v. State of Wisconsin Dep't of Admin.,* 851 F.Supp. at 359 (noting further that Congress and courts have relied upon Rehabilitation Act and its case law in drafting and interpreting ADA). The Seventh Circuit agreed when it affirmed in *Vande Zande,* looking to decisions under the Rehabilitation Act to interpret the same terms used in the employment provisions of the ADA. 44 F.3d at 542.

The ADA is not a carbon copy of Title VII and the Rehabilitation Act, but the treatment of seniority systems under other civil rights legislation provides the context essential to interpreting the ADA with respect to these issues. Title VII expressly protects bona fide seniority systems by statute. *See* § 703(h) of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2(h).[7] The

---

**6.** These conflicts and potential conflicts between the ADA and collective bargaining agreements have been recognized and discussed by a number of commentators. *See, e.g.,* 2 Merrick T. Rossein, Employment Discrimination Law and Litigation § 24.13, at 24–45 to –61 (1994); Ann C. Hodges, *The Americans with Disabilities Act in the Unionized Workplace,* 48 U.Miami L.Rev. 567 (1994); Eric H.J. Stahlhut, *Playing the Trump Card: May an Employer Refuse to Reasonably Accommodate under the ADA by Claiming a Collective Bargaining Obligation?,* 9 Lab. Lawyer 71 (1993); Rose Daly–Rooney, Note, *Reconciling Conflicts Between the Americans with Disabilities Act and the National Labor Relations Act to Accommodate*

*People with Disabilities,* 6 DePaul Bus.L.J. 387 (1994); Barbara A. Lee, *Reasonable Accommodation under the Americans with Disabilities Act: The Limitations of Rehabilitation Act Precedent,* 14 Berkeley J.Emp. & Lab.L. 201 (1993); Jules L. Smith, *An Employee Compliance Checklist: The Employment Provisions of the ADA,* 39 Fed. B.News & J. 81 (1992); Joanne Jocha Ervin, *Reasonable Accommodation and the Collective Bargaining Agreement Under the Americans with Disabilities Act of 1990,* 1991 Det.C.L.Rev. 925 (1991).

**7.** Section 703(h) provides:

ADA does not have such a provision. That distinction alone cannot support a decision not to protect seniority systems, however, since the Rehabilitation Act also did not have a provision like § 703(h). Instead, the courts "imported" § 703(h) from Title VII into the Rehabilitation Act. *See, e.g., Hurst v. U.S. Postal Service,* 653 F.Supp. 259, 262 (N.D.Ga. 1986). In drafting the ADA, Congress could reasonably have expected the courts to do the same thing, absent express statutory direction to the contrary.

The Rehabilitation Act also requires "reasonable accommodation" of disabled employees. Under that Act, however, courts developed a virtual *per se* rule to the effect that reasonable accommodation does not require reassignment of a disabled employee in violation of a bona fide seniority system. *See Shea v. Tisch,* 870 F.2d 786, 789–90 (1st Cir.1989); *Carter v. Tisch,* 822 F.2d 465, 467 (4th Cir.1987); *Jasany v. United States Postal Service,* 755 F.2d 1244, 1251–52 (6th Cir. 1985); *Mason v. Frank,* 32 F.3d 315, 319–20 (8th Cir.1994); *Daubert v. United States Postal Service,* 733 F.2d 1367, 1370 (10th Cir.1984); *Mackie v. Runyon,* 804 F.Supp. 1508, 1511–12 (M.D.Fl.1992); *Florence v. Frank,* 774 F.Supp. 1054, 1062 (N.D.Tex. 1991); *Davis v. United States Postal Service,* 675 F.Supp. 225, 233–34 (M.D.Pa.1987); *Hurst v. United States Postal Service,* 653 F.Supp. 259, 261–63 (N.D.Ga.1986); *Carty v. Carlin,* 623 F.Supp. 1181, 1189 (D.Md.1985).

Eckles has not cited and the court has not found any court decision under the Rehabilitation Act holding that a reasonable accommodation may require violation of the terms of a seniority system. Eckles relies most heavily on two cases decided under the Rehabilitation Act, *Buckingham v. United States,*

998 F.2d 735 (9th Cir.1993), and *Rhone v. United States Dep't of Army,* 665 F.Supp. 734 (E.D.Mo.1987). In *Buckingham,* decided after the ADA was enacted, a postal worker with AIDS sought a transfer from a Mississippi post office to Los Angeles so that he could obtain better medical treatment. The Postal Service refused the transfer on the ground that Buckingham did not have sufficient seniority, so the transfer would violate rights of other workers under a collective bargaining agreement. The Ninth Circuit held that reasonable accommodation under the Rehabilitation Act could require allowing the employee to transfer to a new job. 998 F.2d at 740. The court then turned to the issue of other employees' rights. The court recognized that "numerous cases" had held that rights guaranteed by collective bargaining agreements preclude "reasonable accommodation" for handicapped employees. *Id.* at 741. After close examination of the collective bargaining agreement at issue, the Ninth Circuit held that the transfer "would not 'usurp the legitimate rights of other employees under a collective bargaining agreement.'" *Id.* Under the specific transfer system in place there, Buckingham could have been transferred without displacing anyone else who had rights under the agreement. The same is not true here, so *Buckingham* does not support Eckles on this issue.

In *Rhone,* an Army employee developed an illness that made it difficult for him to work a night shift. He sought a transfer. The court concluded that the Rehabilitation Act required the Army to consider transfer to another position with a more suitable schedule. On the seniority issue, the court held

Notwithstanding any other provision of this title, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any profes-

sionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex, or national origin. It shall not be an unlawful employment practice under this title for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 6(d) of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 206(d)).

that the collective bargaining agreement would not preclude a transfer for several reasons. 665 F.Supp. at 746. The agreement recognized management's right to assign and reassign employees, expressed a policy of adhering to the letter and spirit of equal opportunity laws, and incorporated a regulation that gave precedence to the assignment of handicapped employees. The employer had never even raised the seniority issue or sought the union's agreement to a transfer. *Rhone* therefore does not support Eckles' claim to an assignment that would plainly violate a collective bargaining agreement, especially where the employer and union have insisted all along that the seniority system barred the assignment.

Thus, when Congress drafted and enacted the ADA, it did so against a background of court decisions holding consistently that "reasonable accommodation" of a disabled employee under the Rehabilitation Act does not require a new job assignment that would violate the terms of a bona fide seniority system established by a collective bargaining agreement.

Another important part of the relevant legal landscape when Congress drafted the ADA is the Supreme Court's decision in *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). That decision addressed in detail the relationship between a seniority system in a collective bargaining agreement and an employer's duty of reasonable accommodation of religious practices under Title VII. The case arose under Title VII when an employee's religious beliefs prevented him from working on Saturdays. His employer (as in this case, a transportation business with around-the-clock operations) refused to modify his work schedule in ways that would violate a seniority system under a collective bargaining agreement. When the employee refused to work as assigned, he was discharged. He then sued for religious discrimination, relying on EEOC guidelines that required employers to make "reasonable accommodations to the religious needs of employees" when those accommodations would not work an "undue hardship." In an opinion recognizing the importance of seniority systems in collective bargaining agreements, the Court held that Title VII did not require the employer and union to accommodate an employee by violating the seniority rights of other employees:

> We agree that neither a collective-bargaining contract nor a seniority system may be employed to violate the statute, but we do not believe that the duty to accommodate requires TWA to take steps inconsistent with the otherwise valid agreement. Collective bargaining, aimed at effecting workable and enforceable agreements between management and labor, lies at the core of our national policy, and seniority provisions are universally included in these contracts. *Without a clear and express indication from Congress, we cannot agree with Hardison and the EEOC that an agreed-upon seniority system must give way when necessary to accommodate religious observances.* The issue is important and warrants some discussion.

> Any employer who, like TWA, conducts an around-the-clock operation is presented with the choice of allocating work schedules either in accordance with the preferences of its employees or by involuntary assignment. Insofar as the varying shift preferences of its employees complement each other, TWA could meet its manpower needs through voluntary work scheduling. In the present case, for example, Hardison's supervisor foresaw little difficulty in giving Hardison his religious holidays off since they fell on days that most other employees preferred to work, while Hardison was willing to work on the traditional holidays that most other employees preferred to have off.

> Whenever there are not enough employees who choose to work a particular shift, however, some employees must be assigned to that shift even though it is not their first choice. Such was evidently the case with regard to Saturday work; even though TWA cut back its weekend work force to a skeleton crew, not enough employees chose those days off to staff the Stores Department through voluntary scheduling. In these circumstances, TWA and [the union] agreed to give first preference to employees who had worked in a particular department the longest.

Had TWA nevertheless circumvented the seniority system by relieving Hardison of Saturday work and ordering a senior employee to replace him, it would have denied the latter his shift preference so that Hardison could be given his. The senior employee would also have been deprived of his contractual rights under the collective-bargaining agreement.

It was essential to TWA's business to require Saturday and Sunday work from at least a few employees even though most employees preferred those days off. Allocating the burdens of weekend work was a matter for collective bargaining. In considering criteria to govern this allocation, TWA and the union had two alternatives: adopt a neutral system, such as seniority, or rotating shifts; or allocate days off in accordance with the religious needs of its employees. TWA would have had to adopt the latter in order to assure Hardison and others like him of getting the days off necessary for strict observance of their religion, *but it could have done so only at the expense of others who had strong, but perhaps nonreligious, reasons for not working on weekends.* There were no volunteers to relieve Hardison on Saturdays, and to give Hardison Saturdays off, TWA would have had to deprive another employee of his shift preference at least in part because he did not adhere to a religion that observed the Saturday Sabbath.

Title VII does not contemplate such unequal treatment. The repeated, unequivocal emphasis of both the language and the legislative history of Title VII is on eliminating discrimination in employment, and such discrimination is proscribed when it is directed against majorities as well as minorities. See *supra*, at 71–72 [97 S.Ct. at 2270–71]. Indeed, the foundation of Hardison's claim is that TWA and [the union] engaged in religious *discrimination* in violation of 703(a)(1) when they failed to arrange for him to have Saturdays off. *It would be anomalous to conclude that by "reasonable accommodation" Congress meant that an employer must deny the*

*shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others, and we conclude that Title VII does not require an employer to go that far.*

432 U.S. at 79–81, 97 S.Ct. at 2274–75 (footnote omitted) (emphasis added, except "discrimination" emphasized in original). This reasoning is relevant here because Eckles is demanding that Conrail and the Union "deny the shift and job preference of some employees, as well as deprive them of their contractual rights" in order to accommodate his disability.[8]

■ This case law under both the Rehabilitation Act and Title VII cannot be imported wholesale in applying the ADA. For example, Congress expressly provided in the ADA that reasonable accommodation could include "reassignment to a vacant position," 42 U.S.C. § 12111(9)(B), thus rejecting the Rehabilitation Act cases that refused ever to require that disabled employees be reassigned. In addition, Congress expressly disagreed with part of *TWA v. Hardison* in the legislative history of the ADA. After refusing to require violation of a seniority system, *TWA v. Hardison* went on to address proposed accommodations of giving the employee a four-day work week or replacing him one day a week by paying someone else premium wages. The Court refused to impose those costs and requirements on the employer: "To require TWA to bear more than a *de minimis* cost in order to give Hardison Saturdays off is an undue hardship." 432 U.S. at 84, 97 S.Ct. at 2277. The House report on the ADA commented:

The Committee wishes to make it clear that the principles enunciated by the Supreme Court in *TWA v. Hardison,* [432] U.S. 63 [97 S.Ct. 2264, 53 L.Ed.2d 113] (1977) are not applicable to this legislation. In *Hardison,* the Supreme Court concluded that under title VII of the Civil Rights Act of 1964 an employer need not accommodate persons with religious beliefs if the accommodation would require more than a

---

**8.** In dissent in *TWA v. Hardison,* Justices Marshall and Brennan did not express any willingness to require violations of the seniority system, but argued that other forms of accommodation were available and reasonable. 432 U.S. at 91–96, 97 S.Ct. at 2280–83.

*de minimus* cost for the employer. By contrast, under the ADA, reasonable accommodations must be provided unless they rise to the level of "requiring significant difficulty or expense" on the part of the employer, in light of the factors noted in the statute—i.e., a significantly higher standard than that articulated in *Hardison.* This higher standard is necessary in light of the crucial role that reasonable accommodation plays in ensuring meaningful employment opportunities for people with disabilities.

1990 U.S.C.C.A.N. at 350. Eckles argues that this explicit repudiation of *TWA v. Hardison* means that its treatment of seniority rights should not apply under the ADA. The quoted passage is a good example of how clear Congress can be when it intends to depart from older case law. But the rejection of *TWA v. Hardison* applies only to the "*de minimis*" standard of undue hardship, explicitly contrasting that language in *TWA v. Hardison* with the phrase "requiring significant difficulty and expense" in the ADA, but only in reference to " 'significant difficulty or expense' on the part of the employer." The House report's comments on *TWA v. Hardison* do not suggest that Congress disagreed with the Court's refusal to require an employer to violate seniority rights of other employees or to deny the shift and job preferences of some employees in order to prefer the needs of others. *TWA v. Hardison*'s emphatic recognition of seniority rights and its insistence on "a clear and express indication from Congress" before those rights could be impaired by civil rights legislation provide strong support for the defendants' position here.

What about the many Rehabilitation Act cases holding that employers are not required to violate seniority systems in order to accommodate disabled employees? Eckles argues that the ADA's legislative history shows that Congress also disagreed with those decisions and did not intend for a seniority system to bar, at least in all cases, reassignments to accommodate disabled employees under the ADA. He relies most heavily on a passage from the House committee report on the ADA addressing several ways in which collective bargaining agree-ments might affect the duty of reasonable accommodation:

> Reasonable accommodation may also include reassignment to a vacant position. If an employee, because of disability, can no longer perform the essential functions of the job that she or he has held, a transfer to another vacant job for which the person is qualified may prevent the employee from being out of work and the employer from losing a valuable worker. Efforts should be made, however, to accommodate an employee in the position that he or she was hired to fill before reassignment is considered. The Committee also wishes to make clear the reassignment need only be to a vacant position—"bumping" another employee out of a position to create a vacancy is not required.

> The section 504 regulations [under the Rehabilitation Act] provide that "a recipient's obligation to comply with this subpart [employment] is not affected by any inconsistent term of any collective bargaining agreement to which it is a party." 45 CFR 84.11(c). The policy also applies to the ADA. Thus, an employer cannot use a collective bargaining agreement to accomplish what it otherwise would be prohibited from doing under this Act. For example, a collective bargaining agreement that contained physical criteria which caused a disparate impact on individuals with disabilities and were not job-related and consistent with business necessity could be challenged under this Act.

> *The collective bargaining agreement could be relevant, however, in determining whether a given accommodation is reasonable. For example, if a collective bargaining agreement reserves certain jobs for employees with a given amount of seniority, it may be considered as a factor in determining whether it is a reasonable accommodation to assign an employee with a disability without seniority to the job. However, the agreement would not be determinative on the issue.*

> In other situations, the relevant question would be whether the collective bargaining agreement articulates legitimate business criteria. For example, if the collective

bargaining agreement lists job duties, such a list may be taken into account in determining whether a given task is an essential function of the job. Again, however, the agreement would not be determinative on the issue.

Conflicts between provisions of a collective bargaining agreement and an employer's duty to provide reasonable accommodations may be avoided by ensuring that agreements negotiated after the effective date of this title contain a provision permitting the employer to take all actions necessary to comply with this legislation.

1990 U.S.C.C.A.N. 303, 345–46 (emphasis added).[9]

As Eckles points out, the House committee report states that the seniority system in a collective bargaining agreement "would not be determinative on the issue" whether it is a reasonable accommodation to assign an employee with a disability to a job that another employee is entitled to claim under the seniority system. He asserts that this court should follow this comment in the committee report, deny summary judgment, and leave to the finder of fact at trial the task of balancing his interests against those of other employees to determine whether the accommodation sought is reasonable. That is the approach adopted by the district court in *Emrick v. Libbey Owens–Ford Co.,* 875 F.Supp. 393, 396–97 (E.D.Tex.1995). *But see Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1125 (10th Cir.1995) (holding that ADA did not require accommodation by promoting plaintiffs, and assuming that ADA could not require transfer contrary to seniority system in collective bargaining agreement).

Is that comment in the committee report a sufficiently "clear and express indication from Congress" to require seniority systems to give way? This court does not believe the comment in the House committee report can be or should be given controlling weight in determining the effect of a seniority system on a reassignment sought under the ADA. There are two principal reasons. First, of course, the passage is in the legislative histo-

ry and not in the ADA itself, yet that language would, if given legal effect, substantially impair the rights of other employees recognized by and enforceable under federal law. Such impairment of other federal rights should require explicit statutory language, not merely a comment in a committee report. Second, the brief comment in the committee report tries to say what the law should not be, but does not say what the law should be. Giving binding effect to the comment in the committee report would impose an utterly nebulous legal standard on employers, unions, judges and juries, who would all have to balance the interests of one employee against another with no meaningful guidance from the legislature as to how they should do so.

■ As to the first reason, while legislative history may be used to illuminate obscure or ambiguous statutory language, inserting language in a committee report is no substitute for the constitutional process of enacting laws and presenting them to the President. U.S. Const. art. I, sec. 7. This consideration is especially important when giving effect to the comment in the legislative history would not merely clarify one statute but would also directly impair or nullify other legally enforceable rights granted or recognized by other federal laws. The courts have long followed the general principle that repeals and amendments of statutes by implication are not favored and will not be found unless the intention of Congress was "clear and manifest." *E.g., Rodriguez v. United States,* 480 U.S. 522, 524, 107 S.Ct. 1391, 1392, 94 L.Ed.2d 533 (1987); *St. Martin Evangelical Lutheran Church v. South Dakota,* 451 U.S. 772, 787–88, 101 S.Ct. 2142, 2151, 68 L.Ed.2d 612 (1981); *United States v. Welden,* 377 U.S. 95, 103 n. 12, 84 S.Ct. 1082, 1088 n. 12, 12 L.Ed.2d 152 (1964). In this case, the "repeal" or "amendment" that Eckles sees in the ADA is a repeal or amendment of seniority rights established under collective bargaining agreements and long recognized by federal law and the federal courts.

---

9. The House report copied the third paragraph set out above from an earlier Senate report, *see* Sen.Rep. No. 116, 101st Cong., 1st Sess. 32 (1989), except that the House report added the sentence: "However, the agreement would not be determinative on the issue."

The Supreme Court has repeatedly recognized the importance of seniority systems and the rights they provide. "Collective bargaining, aimed at effecting workable and enforceable agreements between management and labor, lies at the core of our national labor policy, and seniority provisions are universally included in these contracts." *TWA v. Hardison,* 432 U.S. at 79, 97 S.Ct. at 2274. "Seniority systems and the entitlements conferred by credits earned thereunder are of vast and increasing importance in the economic employment system of this Nation. Seniority principles are increasingly used to allocate entitlements to scarce benefits among competing employees ('competitive status' seniority) and to compute noncompetitive benefits earned under the contract of employment ('benefit' seniority)." *Franks v. Bowman Transportation Co., Inc.,* 424 U.S. 747, 766, 96 S.Ct. 1251, 1265, 47 L.Ed.2d 444 (1976) (citations omitted) (holding that victims of discriminatory failure to hire could not be made whole without seniority award). Under Title VII, the Court has specifically recognized the value of the "valid reliance interests" that develop under a seniority system, and "the settled (and worked-for) expectations" of co-workers that can be defeated by judicial interference in a seniority system. *Lorance v. AT & T Technologies, Inc.,* 490 U.S. 900, 912, 109 S.Ct. 2261, 2269, 104 L.Ed.2d 961 (1989).

 The seniority provisions of a collective bargaining agreement are enforceable through mechanisms of federal law, including the Railway Labor Act, as well as the National Labor Relations Act. An employer who unilaterally violates a collective bargaining agreement—by making a job assignment in violation of a seniority system, for example—is violating rights recognized by and enforceable under federal law. *See, e.g.,* 45 U.S.C. § 156 (RLA bars employers from making unilateral changes in work rules or working conditions). The federal recognition of seniority rights obviously does not put those rights off-limits such that Congress may never impair them, but it strongly suggests that any impairment should be the result of enacting clear statutory language rather than by merely inserting language in a committee report. The uniform case law

under the Rehabilitation Act refusing to impair seniority rights of other employees further supports that conclusion.

The second reason for not giving the comment in the committee report controlling weight is that it offers no meaningful standard for federal judges and juries to apply to employers, unions and employees. It is one thing to say, as the committee report did, that the law would not treat the collective bargaining agreement as "determinative." It is quite another to say what the governing rule of law would then be. Such comments in legislative history therefore provide little guidance. The Supreme Court refused to follow a similar comment in *Pierce v. Underwood,* 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988). The case interpreted the Equal Access to Justice Act provision for allowing attorney fee awards where the government's position in litigation is not "substantially justified." A congressional committee report said that the standard "must be more than mere reasonableness." 487 U.S. at 566, 108 S.Ct. at 2550. The Court declined to follow this comment for two reasons. First, it was a comment on the 1985 Congress concerning a 1980 statute. Second, and most relevant here, the comment was contrary to nearly uniform case law *and* provided no clear guidance:

> [O]nly the clearest indication of congressional command would persuade us to adopt a test so out of accord with prior usage, and so unadministerable, as "more than mere reasonableness." Between the test of reasonableness, and a test such as "clearly and convincingly justified"—which no one, not even respondents, suggests is applicable—there is simply no accepted stopping-place, no ledge that can hold the anchor for steady and consistent judicial behavior.

487 U.S. at 567–68, 108 S.Ct. at 2551. The same considerations apply here, for the comment in the committee report both conflicts with essentially uniform case law under the Rehabilitation Act and fails to provide a "ledge that can hold the anchor for steady and consistent judicial behavior."

The House committee report at issue here says that decisions about what accommodations are reasonable must be made on a fact-specific, case-by-case approach. 1990 U.S.C.C.A.N. at 344. When the issue is whether a particular accommodation would impose an unreasonable burden on an *employer*, the statute provides at least some guideposts for evaluating the burden. The statutory factors to be considered on the undue hardship issue include the "nature and cost" of the accommodation; the "overall financial resources" of the facility or facilities involved; the number of persons employed there; the effect of the accommodation on expenses, resources, or operations; and the overall size and financial resources of the covered entity. 42 U.S.C. § 12111(10)(B). All these statutory factors focus attention on the effect an accommodation would have *on the employer or other covered entity*.

The accommodation at issue here differs from any other form of accommodation the ADA might require. The kind of accommodation Eckles demands would impose significant and perhaps heavy costs *on fellow employees*. It would introduce new factors not considered in the statutory definition of undue hardship. Treating a seniority system as "a factor" but not as "determinative"—the view expressed in the House report and in *Emrick*—would require a finder of fact to balance the interests of the disabled worker directly against the interests of another employee who, under the seniority system, would have a legally enforceable right to that particular position. *See* Stahlhut, *supra* note 6, 9 Lab. Lawyer at 93; Daly–Rooney, *supra* note 6, 6 DePaul Bus. L.J. at 413–15. That conflict presents the fact-finder with a problem that is fundamentally different from balancing the burdens on an employer against the interests of a disabled employee.

If the comment in the committee report is given the force of law and is interpreted to call for such a balancing approach, the employer or other covered entity would need to evaluate the reasons the more senior employee wants the position, the consequences to that employee if he or she is denied the position, and the nature and extent of the more senior employee's reliance on the seniority system. These factors would then be "balanced" against the disabled employee's need for the position and the consequences to that person if he or she is denied the desired position, and the availability of other, perhaps less effective, accommodations. Into the mix might be added the effects the requested accommodation (and breach of the seniority system) might have on other employees and the employer's business. Since employees' shift and job preferences may often be based on the needs of family members, it would seem only fair to consider their interests as well. The finder of fact could also be asked to weigh the other benefits the disabled employee has received as a result of the collective bargaining agreement he or she seeks to violate. At trial, the finder of fact would then evaluate the employer's decision and make a *de novo* judgment as to whether the competing interests were correctly balanced.[10]

Neither the statute nor the House committee report offers any meaningful guidance as to how those interests of competing employees should even be measured, let alone balanced. Of course, there may well be strong

---

**10.** One commentator has argued for a "multifactorial test" that would require the finder of fact to consider at least the following factors where the ADA appears to conflict with a seniority system in a collective bargaining agreement:

 (1) whether the accommodation raises an actual conflict with the "right" of another employee;
 (2) if the accommodation affects another employee and the nature of the effect;
 (3) the weight the agreement gives seniority;
 (4) the existence of other exceptions to the provision;
 (5) the reason the senior employee needs the position in question;
 (6) the existence of alternative accommodation(s) that do not conflict with the terms of the collective bargaining agreement; and
 (7) the burden on non-disabled union members in the relative work site.

*Daly–Rooney, supra* note 6, 6 DePaul Bus.L.J. at 413–14. Another commentator argues for a "totality of the circumstances" test to resolve such conflicts between disabled employees and more senior employees. *Ervin, supra* note 6, 1991 Det.C.L.Rev. at 971.

public policy reasons for employers and unions, working together, to weigh such a broad range of factors in resolving such conflicts. However, the ADA's silence as how to balance the rights and interests of one worker against another is strong evidence that the ADA does not permit the finder of fact in a federal court to second-guess the decision of the employer and union.

Eckles suggests that this uncertainty is an ordinary consequence of a new statute and that Congress intended the courts to develop this balancing test as the case law develops. In some situations that type of uncertainty might be tolerable for a while, but the lack of legislative guidance here is virtually complete. The struggles of the EEOC and the NLRB General Counsel to explain what Congress meant are strong evidence that the suggested balancing test would require courts to develop rules out of whole cloth. Although *Emrick* clearly implies that such a balancing is necessary, it also offers no specifics. No other case has held that reasonable accommodation under the ADA (or the Rehabilitation Act or Title VII) requires that the rights of other employees under collective bargaining agreements give way to allow the accommodation, let alone offered guidance as to how to balance such interests.

In addition, under Eckles' proposed interpretation of the ADA, the employer faces adverse legal consequences no matter which employee it chooses to favor. If the employer unilaterally decides to bump a senior employee in order to accommodate a disabled employee, the employer faces a grievance and arbitration. The employer may be able to argue that the action was required by the ADA, or that the disabled employee's interests outweighed those of the bumped employee, but that is the sort of question on which one can expect reasonable minds to differ. On the other hand, if the employer chooses not to violate the seniority system, Eckles would have the district judge or a jury weigh the interests of the disabled employee against those of the employee who would have been bumped. If the employer changed its mind, so as to favor first one

employee and then the other, it is easy to imagine the two separate decisionmakers (one in the grievance and one in district court in the ADA action) reaching opposite conclusions, so that the employer would lose *both* actions.

An employer in such cases is likely to be indifferent as to which employee's interests must yield. That was true here. Conrail says it would have been happy to accommodate Eckles by letting him bump another employee, but it was not willing to act unilaterally in violation of the collective bargaining agreement. However, if Eckles is right and the ADA requires this sort of balancing test, it would put the employer in the position of a neutral stakeholder who might look for some civil rights and labor law variant of an interpleader action. Under this approach to the ADA, any sensible employer would want to have someone else be responsible for making the tough decision, but there is no such mechanism available.[11]

Balancing seniority rights against the rights of disabled employees is without question a knotty problem, as a matter of public policy. The comments in the House committee report show that Congress was aware of these potential conflicts. The brief comment on seniority systems shows that Congress actually considered the question and perhaps even intended for employers to make such choices between disabled employees and more senior employees, and for judges and juries to choose in some unspecified manner between disabled employees and more senior employees. However, the comment certainly does not show that Congress made any deliberate decision about how such conflicts should be resolved. Such a choice in the ADA would pit the interests of one employee against another, and the resolution of those conflicts according to law is, to say the least, a delicate and difficult task. Nowhere else in the statute or the legislative history does Congress suggest how finders of fact should balance those competing interests. Congress provided "no ledge that can hold the anchor for steady and consistent judicial behavior" on this issue. *See Pierce v. Underwood*, 487

---

**11.** Unions might also face potential liability for breach of their duty of fair representation to a

disappointed employee. *See generally* NLRB Gen. Couns. Mem. 92–9, 1993 WL 407395.

U.S. at 568, 108 S.Ct. at 2551. The legislative record at most shows that Congress recognized the problem but then chose *not* to make any explicit decision to impose on other employees the burden of reasonable accommodation.[12]

The lack of legislative guidance and the sheer difficulty of weighing those incommensurable costs and benefits—to choose which employee to hurt—are strong indications that courts should not attempt the task without "a clear and express indication from Congress." *TWA v. Hardison,* 432 U.S. at 79, 97 S.Ct. at 2274. Where Congress was unwilling to make such a difficult choice explicitly in the statute, courts should not step up and make that essentially legislative decision about whose interests to favor. *See* Hodges, *supra,* note 6, 48 U.Miami L.Rev. at 596–602, 608 (ADA does not require violation of other employees' seniority rights, but Congress should clarify the matter). The court recognizes, of course, that a decision to protect bona fide seniority systems from impairment by the ADA also reflects a choice. But seniority rights are firmly established in federal labor law and policy, and, as *TWA v. Hardison* explained, should not be set aside without a clear and express decision by Congress. 432 U.S. at 79, 97 S.Ct. at 2274. *See generally Lutheran Hospital of Indiana, Inc. v. Business Men's Assurance Co.,* 51 F.3d 1308, 1314 (7th Cir.1995) (rejecting statutory interpretation of ERISA and COBRA that would require courts to decide when a gap in insurance coverage is "significant":

"These questions are ones which courts should not ask or answer without congressional authorization or direction"). *See also Pierce v. Underwood,* 487 U.S. at 567–68, 108 S.Ct. at 2551 (rejecting reliance on House committee report language that provided "no ledge that can hold the anchor for steady and consistent judicial behavior"; "only the clearest indication of congressional command would persuade us to adopt a test so out of accord with prior usage and so unadministerable"). Without much clearer indications from Congress that it intended for employers to be put in this untenable position (even for a few years while case law "develops"), the ADA should not be interpreted to require them to choose which employee's interests to favor.[13]

This discussion does not extend to forms of accommodation that might violate the terms of a collective bargaining agreement without actually impairing the rights of other employees. There may well be situations where a minor departure from the terms of a collective bargaining agreement could accommodate a disabled employee without interfering with other employees' contractual rights. *See, e.g.,* NLRB Gen. Couns. Mem. 92–9, 1993 WL 407395 at *1; Hodges, *supra* note 6, 48 U.Miami L.Rev. at 615–16. This court's reasoning is based on the rights of other employees. If those rights are not affected, the collective bargaining agreement should not stand as an obstacle to accommodation.

---

**12.** To the contrary, after recognizing the problem in the House report, and without offering a solution, Congress suggested that this problem be avoided "by ensuring that agreements negotiated after the effective date of this title contain a provision permitting the employer to take all actions necessary to comply with this legislation." 1990 U.S.C.C.A.N. at 346. That solution, turning the matter over to the collective bargaining process, is consistent with federal labor law and policy. However, it remains to be seen whether the report's suggestion that employees solve the problem by agreeing to let employers take unilateral action reflects more hope than realism in dealing with conflicting interests of several employees. *See* 2 Merrick T. Rossein, Employment Discrimination Law and Litigation § 24.13[8] at 24–59 (1994) ("highly unlikely that unions will grant employers the broad discretion proposed in the Senate report"); *Stahlhut, supra* note 6, 9 Lab.Lawyer at 92 (remains to be seen

what concessions management would offer in return for such a provision).

**13.** One commentator has argued that, because the list of factors in the ADA for determining whether an accommodation is reasonable or would impose an undue hardship addresses only the burdens on the employer and is silent about other employees, courts should not even consider the effects of the proposed accommodation on other employees. Lee, *supra* note 6, 14 Berkeley J. Employment & Lab.L. at 223. In view of the solid body of case law under the Rehabilitation Act holding that other employees' legitimate seniority rights need not be infringed to accommodate a disabled worker, the opposite inference from the statutory silence is more plausible—Congress was not willing to impose any substantial burden on other employees.

This discussion is also not intended to discourage the use of provisions like that suggested by Congress, allowing an employer to take "all actions necessary to comply" with the ADA, or like Rule 2–H–1 in this case, requiring employer and union agreement before an assignment could be made in violation of seniority rights. Such agreed methods for resolving conflicts between the interests of fellow workers may well result in the best balance of those interests. But the issue here is whether Congress, in enacting the ADA, impaired the seniority rights of workers under collective bargaining agreements. There certainly has been no "clear and express indication from Congress" to that effect, *see TWA v. Hardison,* 432 U.S. at 79, 97 S.Ct. at 2274, and this court therefore concludes that the ADA should not be construed so as to require as reasonable accommodation job assignments that would impair those rights under bona fide seniority systems.

■ In this case, Conrail had in place a seniority system, pursuant to an agreement with the Union, that acted as a bar to Eckles' entry into positions for which he was otherwise qualified. The position he wanted and temporarily obtained, and from which he was ultimately bumped, was the second shift yardmaster position at Hawthorne. As long as the seniority system was bona fide, that is, not a fiction created for the purpose of discrimination, Conrail and the Union were not required to bump a more senior employee to accommodate Eckles. In fact, because the ADA does not require "bumping," Conrail and the Union initially gave Eckles more accommodation than the ADA requires when they gave him a special placement under Rule 2–H–1.

■ At oral argument on defendants' motions, counsel for Conrail pointed out that in a seniority system, no position is ever really "vacant." The court agrees. *See also* Smith, *supra* note 6, 39 Fed.B.News & J. 81 (same). Under the seniority system, whenever a vacancy occurs, the seniority system spells out the mandatory process for filling that vacancy according to the rights granted by the system. That process is enforceable as a matter of federal law under the Railway Labor Act. In view of the statutory language in the ADA referring to reasonable accommodation by reassignment only to "vacant" positions, the better reading of the statutory language is that the ADA does not require reassignment to a position where the reassignment conflicts with another employee's rights under the valid terms of a collective bargaining agreement. *See* 42 U.S.C. § 12111(9)(B).

■ However, because of the initial reassignment, not required by the ADA, Eckles' claim is a little different from one seeking reassignment in the first instance. Eckles' claim is that he should not have been bumped after he obtained that second shift position, that the ADA should "protect" him in that position regardless of seniority by suspending normal operation of the seniority system. That assertion cannot stand in light of the foregoing analysis. If Conrail and the Union were not obligated to displace a more senior worker from a position to accommodate Eckles in the first place, they were not obligated to suspend the operation of the seniority system to protect him from being bumped by a more senior employee who was entitled to claim the position under the collective bargaining agreement.

■ Rule 2–H–1, the provision in the collective bargaining agreement that gave Conrail and the Union discretion to displace more senior workers to accommodate disabled individuals, does not change the analysis. Eckles was originally placed in the second shift position at Hawthorne pursuant to Rule 2–H–1. If the ADA does not require parties to a collective bargaining agreement to include such a provision in the agreement, it does not require them to agree to its application in a particular case. Of course, if there were evidence that certain types of disabilities were accommodated regularly, but that others were not, that evidence might support a claim of discrimination. The seniority system in such a case would not be bona fide, and the seniority preference it creates should be questioned. Similarly, if an employee can show that the employer reassigns, transfers, and displaces incumbents routinely for other than legitimate

business reasons, the employer should not be able to refuse to accommodate a disabled employee by the same means. *See Bates v. Long Island R. Co.,* 997 F.2d 1028, 1035 (2d Cir.1993) (under Rehabilitation Act, employer may not deny employee his or her contractual right to bid for reassignment); *Rhone v. United States Dep't of Army,* 665 F.Supp. at 744–45 (Army's long history of reassignment in similar circumstances contributed to finding that accommodation required reassignment of handicapped employee).

In this case, however, Eckles has presented no evidence that Conrail and the Union created or maintained Rule 2–H–1 as a means of discrimination against disabled workers. There is no evidence that it has been used selectively on any suspect basis. To the contrary, the provision seems to be a good faith attempt to do more than the ADA requires in assisting employees who become disabled to stay employed with Conrail. The condition that both the employer and union agree to a special placement does not violate the ADA, and the ADA cannot be used to compel either party to agree. (To the extent that Eckles argues that the Union and Conrail have not properly applied Rule 2–H–1, any such claims are preempted, as discussed in the next section of this opinion.)

Like many commentators, this court believes such cases of unavoidable and direct conflict between the ADA and a seniority system in the collective bargaining agreement are likely to be rare. In most cases, some other form of reasonable accommodation will be available, or a mutually agreeable resolution can be reached.[14] For example, in *Emrick v. Libbey–Owens–Ford Co.,* other workers had voluntarily offered to relinquish

their own assignments and accept reassignment to allow accommodation of the disabled plaintiff. 875 F.Supp. at 397 & n. 1 (voluntary swap may be reasonable accommodation, but employer could show other factors why involuntary swap is not possible). In this case, however, Eckles has insisted that the only reasonable accommodation for his disability is a special job assignment that would conflict directly with other employees' rights under the collective bargaining agreement. The ADA does not require such accommodation.

*IV. Is Eckles' Attempt To Invoke Rule 2–H–1 Preempted By The Railway Labor Act?*

 The court has concluded that the ADA does not require that Eckles be accommodated by a job assignment that would violate the seniority system. Eckles argues that the conflict is not inevitable because Rule 2–H–1 allows the Union and Conrail to agree (as they did briefly here) to place him in a job notwithstanding the seniority system. Because the collective bargaining agreement permits such placements, Eckles argues, the ADA should require Conrail and the Union to agree to the placement in his case. He also argues that the Union should not have been permitted to rescind its initial agreement to his special placement under Rule 2–H–1.

 Regardless of their possible merit as a matter of contract construction, these claims based on Rule 2–H–1 necessarily arise under the collective bargaining agreement. As such, they are preempted by the Railway Labor Act, 45 U.S.C. § 151 *et seq.,* and must

---

14. Hodges, *supra* note 6, 48 U.Miami L.Rev. at 615 ("While every accommodation that conflicts with the contract violates the rights of employees protected by the agreement in a broad sense, many accommodations will not infringe directly on any employee's contractually based expectations"); Jerry M. Hunter, *Potential Conflicts Between Obligations Imposed on Employers and Unions by the National Labor Relations Act and the Americans with Disabilities Act,* 13 N.Ill.U.L.Rev. 207, 216 (1993) (NLRB General Counsel stating that in some instances proposed accommodation which is in direct conflict with NLRA may be only possible accommodation, but reminding that ADA does not require best possible accom-

modation); Daly–Rooney, *supra* note 6, 6 DePaul Bus.L.J. at 414 (if alternatives to proposed accommodation exist which do not interfere with another worker's rights, those accommodations should be implemented first); Mary K. O'Melveny, *The Americans with Disabilities Act and Collective Bargaining Agreements: Reasonable Accommodations or Irreconcilable Conflicts?,* 82 Ky. L.J. 219, 231–32 (1993/94) (predicting that early involvement of union in accommodation attempt would not only become model for finding solutions that minimize "disruptive impact on other contractual rights," but would also eliminate "direct dealing" problem under labor acts).

be pursued through that Act's dispute resolution mechanisms. "The RLA ... sets up a mandatory arbitral mechanism to handle disputes 'growing out of grievances or out of the interpretation and application of agreements concerning rates of pay, rules, or working conditions.'" *Hawaiian Airlines, Inc. v. Norris,* —— U.S. ——, ——, 114 S.Ct. 2239, 2241, 129 L.Ed.2d 203 (1994); *Andrews v. Louisville & Nashville R.R. Co.,* 406 U.S. 320, 322, 92 S.Ct. 1562, 1564, 32 L.Ed.2d 95 (1972). So-called "minor disputes" "involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation." *Norris,* —— U.S. at ——, 114 S.Ct. at 2244 (quoting *Trainmen v. Chicago R & I.R. Co.,* 353 U.S. 30, 33, 77 S.Ct. 635, 637, 1 L.Ed.2d 622 (1957)).

■ The issue here is not whether the RLA preempts *any* ADA claims by covered workers. *Cf. Atchison Topeka & Santa Fe R. Co. v. Buell,* 480 U.S. 557, 564–65, 107 S.Ct. 1410, 1415, 94 L.Ed.2d 563 (1987) (RLA does not preempt claims for injuries pursuant to FELA). The issue is whether the RLA preempts Eckles' claims that the Union and Conrail were required to agree to give him special placement according to Rule 2–H–1 and to continue that placement. The RLA does not preempt claims based on rights and obligations that exist independent of the collective bargaining agreement. *Hawaiian Airlines v. Norris,* —— U.S. at ——, 114 S.Ct. at 2247.

Eckles' claims for a Rule 2–H–1 placement necessarily "arise under" the collective bargaining agreement because they seek to vindicate a substantive right derived from the collective bargaining agreement. The court has already held that the ADA does not require Conrail and the Union to violate the agreed seniority system. If that is correct, then the ADA does not require them to include in the collective bargaining agreement the flexibility that Rule 2–H–1 permits. To the extent that Eckles seeks to invoke Rule 2–H–1, therefore, he is asserting rights that were created in the collective bargaining agreement itself, if they exist at all. Those claims therefore are not independent of, but arise under, the agreement.

■ In addition, Eckles' claims based on Rule 2–H–1 could not be decided without interpreting and applying the terms of the collective bargaining agreement to this particular situation. Therefore, these claims fit squarely into the category of a minor dispute under the RLA, *see Norris,* —— U.S. at ——–——, 114 S.Ct. at 2249–50; *Consolidated Rail Corp. v. Railway Labor Exec. Ass'n,* 491 U.S. 299, 302–03, 109 S.Ct. 2477, 2480–81, 105 L.Ed.2d 250 (1989), and are therefore preempted. *Compare Davis v. Johnson Controls, Inc.,* 21 F.3d 866, 868 (8th Cir.1994) (disabled employee sought reassignment under state law; remedy implicated collective bargaining agreement and seniority rights, and claims were therefore preempted under Labor Management Relations Act), *with Hirras v. National R.R. Passenger Corp.,* 44 F.3d 278, 285 (5th Cir. 1995) (RLA does not preempt tort claim based on employer's duty which is created by state law and exists independent of collective bargaining agreement).

■ Because Eckles' claims, to the extent they are based on Rule 2–H–1 of the collective bargaining agreement, are preempted under the RLA, they must be dismissed for lack of subject matter jurisdiction. *Underwood v. Venango River Corp.,* 995 F.2d 677, 686 (7th Cir.1993), *overruled on other grounds, Westbrook v. Sky Chefs, Inc.,* 35 F.3d 316, 317 (7th Cir.1994). Those claims must be pursued, if at all, pursuant to the minor dispute resolution mechanisms of the RLA.

*V. Did Conrail Retaliate Against Plaintiff?*

■ Finally, Eckles claims that Conrail retaliated against him in a number of ways for requesting accommodation of his disability and for filing charges of disability discrimination with the EEOC. Employees are protected from adverse employment decisions made by an employer in retaliation for the employee's exercise of protected activity. *See* 42 U.S.C. § 12203.

After Eckles had his second seizure on June 4, 1993, Conrail determined that Eckles was unable to return to work on June 7, 1993. On June 28, 1993, Eckles' physician,

Dr. D'Ambrosio, released him to work immediately. Eckles, however, could not return to work without Conrail's clearance. Conrail performed a return-to-work physical examination of Eckles on June 30, 1993, but did not release him to return to work until September 27, 1993. Eckles claims that Conrail did not perform any new examination on him between the June 30 physical and the time it released him to work on September 27. Eckles actually returned to work on October 28, 1993.

Taken in the light most favorable to Eckles, the evidence shows that, from June 4, 1993, to October 28, 1993, Conrail paid Eckles disability payments based on a percentage of his normal salary. From these payments, Conrail deducted $33.00 per day to offset payments which were to have been made by the Railroad Retirement Board under the Railroad Retirement Unemployment and Sickness Act. In early July 1993, the Railroad Retirement Board sent Eckles a form that had to be completed by a physician stating that he was unable to work. Otherwise, his benefits under the Act would cease on August 1, 1993. Dr. D'Ambrosio could not certify that Eckles was unable to return to work because he had already released Eckles to work on June 28. Because it was Conrail who had not yet determined that Eckles could return to work, Eckles sent Conrail the form to be completed by the Conrail Medical Director. Conrail did not complete the form for the Railroad Retirement Board, did not notify Eckles that it would not complete the form, did not rescind its June 7 determination that he could not work, and did not stop deducting the $33.00 per day to offset the benefits from the Railroad Retirement Board.

The issue whether Conrail should have certified Eckles as disabled or in the alternative should have stopped deducting the offsets became moot when he went back to work on October 28, 1993. However, Eckles states that Conrail did not reimburse him until January 24, 1995, for the accumulated offsets mistakenly deducted from his disability payments, and that even when Conrail did reimburse him, it did not pay him interest. Eckles also claims that as a result of Con-

rail's failure to certify him as disabled, he was refused health insurance coverage by the carrier who administers Conrail's health insurance program. Eckles says that as a result he had to incur personal liability for his own medical treatment and for that of his physically disabled wife. As another consequence of Conrail's delays, Eckles claims, he lost the ability to earn vacation, sick, and personal days for 1994. Eckles claims that Conrail's failure to certify his inability to work to the Railroad Retirement Board while still making deductions for offsets under the Railroad Retirement Act is evidence of Conrail's retaliation against him for filing discrimination charges and seeking accommodation of his disability.

■■■ To establish a prima facie case of retaliation under the ADA, a plaintiff must prove that "(1) he engaged in a protected activity; (2) his employer took an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse action." *Harmer v. Virginia Elec. and Power Co.*, 831 F.Supp. 1300, 1308 (E.D.Va.1993). The letters and documents submitted by Eckles in support of his retaliation claim are evidence that Conrail made administrative errors concerning the processing of Eckles' disability pay and the fixing of his disability status. However, Eckles points to no evidence from which reasonable jurors could infer causation, that is, that Conrail took these actions deliberately and willfully to retaliate against him for filing his charge. On this record, the jury would have to engage in speculation, based on the timing of the errors alone, in order to find a causal connection between Conrail's actions (and errors) and Eckles' complaints of discrimination.

Instead of offering evidence of causation, Eckles argues that Conrail has failed to come forward with facts or evidence to which he can respond, and that Conrail has therefore failed to meet its burden for summary judgment. However, because Eckles has the burden of proving causation as an element of his retaliation claims, Conrail could move for summary judgment simply by pointing to the absence of evidence on that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct.

2548, 2553, 91 L.Ed.2d 265 (1986). Eckles, as the party with the burden of proof on the issue, has not produced evidence of causation sufficient to enable a jury to find in his favor, so Conrail is entitled to summary judgment on the retaliation claims.

## CONCLUSION

For the foregoing reasons, the motions for summary judgment of defendants Conrail and the Union are GRANTED, and Eckles' claims are dismissed on the merits, except that his claims based on Rule 2–H–1 of the collective bargaining agreement are dismissed for lack of subject matter jurisdiction. In view of the novelty of the issues presented and the consequences the plaintiff experienced from the refusal to reassign him, the court will exercise its discretion under Fed. R.Civ.P. 54(d) to decline to award costs to defendants. Judgment will be entered immediately.